**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 25, 2007

*In re* CERTIFIED QUESTION FROM
THE FOURTEENTH DISTRICT COURT OF
APPEALS OF TEXAS,

_____

GLENN MILLER, ESTATE OF CAROLYN
MILLER, SHAWN DEAN, JOHN ROLAND,
and ALMA ROLAND,

     Plaintiffs,

v

No. 131517

FORD MOTOR COMPANY,

     Defendant.

_____

BEFORE THE ENTIRE BENCH

MARKMAN, J.

Plaintiffs filed suit in Texas against defendant, alleging that the decedent contracted mesothelioma from washing the work clothes of her stepfather who worked for independent contractors who were hired by defendant to reline the interiors of blast furnaces with materials that contained asbestos. A jury found in

favor of plaintiffs. Pursuant to MCR 7.305(B), the Fourteenth District Court of Appeals of Texas certified the following question to this Court:

> Whether, under Michigan law, Ford, as owner of the property on which asbestos-containing products were located, owed to Carolyn Miller, who was never on or near that property, a legal duty specified in the jury charge submitted by the trial court,[1] to protect her from exposure to any asbestos fibers carried home on the clothing of a member of Carolyn Miller's household who was working on that property as the employee of an independent contractor.

Having granted the request to answer the certified question, and having heard oral argument, we answer the question in the negative.[2] Under Michigan

---

[1] The jury was asked to decide whether defendant was negligent and was instructed that "[n]egligence is the failure to use ordinary care." Therefore, the legal duty specified in the jury charge submitted by the trial court was the duty to use ordinary care.

[2] Justice Weaver restates her belief that this Court lacks the authority to answer certified questions, but she has not prevailed on this issue. See, e.g., *In re Certified Question* (*Kenneth Henes Special Projects Procurement v Continental Biomass Industries, Inc*), 468 Mich 109; 659 NW2d 597 (2003); *In re Certified Question* (*Wayne Co v Philip Morris, Inc*), 465 Mich 537, 543-545; 638 NW2d 409 (2002), certified questions in which Justice Weaver participated in this Court's substantive decisions. For one justice's response to Justice Weaver's constitutional arguments, see *In re Certified Question* (*Melson v Prime Ins Syndicate, Inc*), 472 Mich 1225, 1231-1242 (2005) (Markman, J., dissenting). Moreover, we see no constitutional distinction in whether a certified question has come to this Court from another state's supreme court or from its court of appeals. See MCR 7.305(B) (allowing this Court to consider certified questions from a "federal court, state appellate court, or tribal court").

Concerning Justice Cavanagh's solicitude for Justice Young's "constitutional conscience," *post* at 1-2, Justice Young, like Justice Weaver, has written that this Court lacks the authority to answer certified questions, but his position did not carry the day. See *Melson, supra* at 1226 (Young, J., concurring).

(continued…)

law, Ford, as owner of the property on which asbestos-containing products were located, did not owe to Carolyn Miller, who was never on or near that property, a legal duty to protect her from exposure to any asbestos fibers carried home on the clothing of a member of her household who was working on that property as the employee of independent contractors, where there was no further relationship between defendant and Miller. Having answered the certified question, we now return the matter to the Fourteenth District Court of Appeals of Texas for such further proceedings as that court deems appropriate.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiffs allege that the decedent, Carolyn Miller, died from mesothelioma, an incurable and fatal form of lung cancer, that she contracted from washing the

(…continued)

Five justices, including Justice Cavanagh, disagreed. Just as Justice Cavanagh is within his rights as a supporter of certified questions not to answer a certified question in a particular case (his position here), Justice Young as an opponent of certified questions is within his rights to answer a certified question, because this is now a part of our state's "judicial power." Indeed, Justice Young has previously answered certified questions and, in fact, authored a majority opinion responding to a certified question. *Kenneth Henes, supra.* Justice Young also joined Justice Cavanagh's opinion in *Wayne Co, supra.* This is obviously all well known to Justice Cavanagh, who made no similar objections to Justice Young's participation in these previous cases in which he and Justice Young were in agreement on the results. In respecting that the law is the law even where he disagrees with that law, Justice Young's determination to respect the majority position of this Court and to participate in certified questions is the only honorable position that could be taken by a justice of this Court.

3

work clothes of her stepfather, Cleveland "John" Roland.[3]  From 1954 through

1965, Roland worked for independent contractors who were hired on various

occasions by defendant to reline the interiors of blast furnaces used to melt iron

ore at the Ford Rouge plant in Dearborn, Michigan.  Plaintiffs allege that the

materials used to reline the interiors of the blast furnaces contained asbestos.

There is no dispute that Miller was never on or near defendant's premises.  Miller

was diagnosed with mesothelioma in 1999 and died in 2000.  After the Texas trial

court denied defendant's motion for a directed verdict, a Texas jury awarded

plaintiffs $9.5 million for Carolyn Miller's death on the basis of a theory of

negligence.[4]  After the trial court denied defendant's motion for judgment

notwithstanding the verdict, defendant filed an appeal in the Fourteenth District

Court of Appeals of Texas.  At defendant's request and over plaintiffs' objections,

the Fourteenth District Court of Appeals of Texas certified the above-quoted

question to this Court.  We granted the request to answer the question and heard

oral argument.  477 Mich 1277 (2006).

---

[3] Plaintiffs are the personal representative of the decedent's estate and the decedent's stepfather, husband, daughter, and mother.

[4] The jury awarded Miller's estate $4.5 million and Miller's husband, daughter, and mother a total of $5 million for Miller's death.  The jury also awarded $500,000 to John Roland for his own injuries on a premises liability theory.

4

## II. STANDARD OF REVIEW

Whether a defendant owes a duty to a plaintiff to avoid negligent conduct is a question of law that is reviewed de novo.[5] *Dyer v Trachtman,* 470 Mich 45, 49; 679 NW2d 311 (2004), citing *Simko v Blake,* 448 Mich 648, 655; 532 NW2d 842 (1995).

## III. ANALYSIS

## A. LEGAL DUTY IN GENERAL

There is no dispute among the parties that the substantive law of Michigan governs plaintiffs' claims.[6] In Michigan, "the question whether the defendant owes an actionable legal duty to the plaintiff is one of law which the court decides after assessing the competing policy considerations for and against recognizing the asserted duty." *Friedman v Dozorc,* 412 Mich 1, 22; 312 NW2d 585 (1981). That is, ""[d]uty" is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection."" *Buczkowski v McKay,* 441 Mich 96, 100-101; 490 NW2d 330 (1992), quoting *Friedman, supra* at 22 n 9, quoting Prosser, Torts (4th ed), §

---

[5] As plaintiffs concede, this is a negligence action, not a premises liability action.

[6] Although defendant has raised a number of issues on appeal, including whether John Roland was even exposed to asbestos at defendant's plant, the only issue before us concerns defendant's duty to Carolyn Miller.

53, pp 325-326.[7]  Thus, the ultimate inquiry in determining whether a legal duty should be imposed is whether the social benefits of imposing a duty outweigh the social costs of imposing a duty.  The inquiry involves considering, among any other relevant considerations, "'the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented.'" *Dyer, supra* at 49, quoting *Murdock v Higgins,* 454 Mich 46, 53; 559 NW2d 639 (1997), citing *Buczkowski, supra* at 100.

The most important factor to be considered is the relationship of the parties. "[A] duty arises out of the existence of a relationship 'between the parties of such a character that social policy justifies' its imposition.'" *Dyer, supra* at 49, quoting Prosser & Keeton, Torts (5th ed), § 56, p 374. "'The determination of whether a legal duty exists is a question of whether the relationship between the actor and the plaintiff gives rise to any legal obligation on the actor's part to act for the benefit of the subsequently injured person.'" *Buczkowski, supra* at 101 n 5, quoting *Rodriguez v Sportsmen's Congress,* 159 Mich App 265, 270; 406 NW2d 207 (1987). "The duty to protect others against harm from third persons is based on a relationship between the parties." *Buczkowski, supra* at 103, citing Prosser &

[7] See also *Buczkowski, supra* at 101 n 5, quoting *Samson v Saginaw Professional Bldg, Inc,* 393 Mich 393, 419; 224 NW2d 843 (1975) (Levin, J., dissenting) ("[T]he duty question turns on policy considerations . . . ."); *Smith v Allendale Mut Ins Co,* 410 Mich 685, 716 n 24; 303 NW2d 702 (1981) ("In imposing tort liability . . . a court is . . . concerned with whether it is appropriate public policy to impose liability for particular conduct . . . .").

Keeton, Torts (5th ed), § 56, p 385. "Only if the law recognizes a duty to act with due care arising from the relationship of the parties does it subject the defendant to liability for negligent conduct." *Friedman, supra* at 22. "Duty . . . 'concerns "the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other."'" *Buczkowski, supra* at 100, quoting *Friedman, supra* at 22, quoting Prosser & Keeton, Torts (5th ed), § 53, p 356. See also *Buczkowski, supra* at 100 (referring to "duty" as "the relational obligation between the plaintiff and the defendant").[8]

In *Dyer,* this Court focused exclusively on the relationship between the parties to determine whether the defendant owed the plaintiff a legal duty. We concluded that because there was only a limited relationship between the parties, only a limited duty could be imposed on the defendant. More specifically, we concluded that because there was only a limited relationship between the defendant physician performing the independent medical examination (IME) and the plaintiff patient, the physician only owed a limited duty to the patient, i.e., a duty to perform an IME in a manner not causing physical harm to the patient. In reaching this decision, we explained that "the duty of care in a medical

_____

[8] See also *Simko, supra* at 655 ("In legal malpractice actions, a duty exists, as a matter of law, if there is an attorney-client relationship."); *Murdock, supra* at 54 ("Where there is a duty to protect an individual from a harm by a third person, that duty to exercise reasonable care arises from a 'special relationship' either between the defendant and the victim, or the defendant and the third party who caused the injury.").

malpractice action has its basis in the relationship between the physician and the patient." *Dyer, supra* at 50. Because we found that only a limited relationship existed, we did not even address the other factors, i.e., the foreseeability of the harm, the burden on the defendant, or the nature of the risk presented. Consideration of the other factors was unnecessary because when there is only a limited relationship between the parties, only a limited duty can be imposed.

In *Buczkowski,* this Court similarly focused exclusively on the relationship between the parties to determine whether the defendant owed the plaintiff a legal duty. We concluded that because there was no relationship between the parties, no duty could be imposed on the defendant. More specifically, this Court concluded that because there was no relationship between the retailer who sold the shotgun ammunition to the intoxicated customer and the bystander who was injured by the use of the ammunition, the retailer owed no duty to the bystander. We explained, "Our ultimate decision turns on whether a sufficient relationship exists between a retailer and a third party to impose a duty under these circumstances." *Buczkowski, supra* at 103. Because we found that no relationship existed, we again did not even address the other factors. This was unnecessary because when there is no relationship between the parties, no duty can be imposed.

On the other hand, even when there is a relationship between the parties, a legal duty does not necessarily exist. In order to determine whether a duty exists, the other enumerated factors must also be considered. The foreseeability of the harm is one of these. Just as the existence of a relationship between the parties is

8

not dispositive, that the harm was foreseeable is also not dispositive.  A defendant does not have a duty to protect everybody from all foreseeable harms.  Although foreseeability is a factor to be considered, "other considerations may be, and usually are, more important." *Id.* at 101.

> "[T]he mere fact that an event may be foreseeable does not impose a duty upon the defendant to take some kind of action accordingly.  The event which he perceives might occur must pose some sort of risk of injury to another person or his property before the actor may be required to act.  Also, to require the actor to act, some sort of relationship must exist between the actor and the other party which the law or society views as sufficiently strong to require more than mere observation of the events which unfold on the part of the defendant.  It is the fact of existence of this relationship which the law usually refers to as a duty on the part of the actor." [*Id.* at 101, quoting *Samson v Saginaw Professional Bldg, Inc,* 393 Mich 393, 406; 224 NW2d 843 (1975).]

When the harm is not foreseeable, no duty can be imposed on the defendant.  But when the harm is foreseeable, a duty still does not necessarily exist.[9]

To summarize, in determining whether a defendant owes a duty to a plaintiff, competing policy factors must be considered.  Such considerations include: the relationship of the parties, the foreseeability of the harm, the burden that would be imposed on the defendant, and the nature of the risk presented.  Where there is no relationship between the parties, no duty can be imposed, but

---

[9] See *Ross v Glaser,* 220 Mich App 183, 196 n 1; 559 NW2d 331 (1996) (Markman, J., dissenting) ("foreseeability is a *necessary* condition of duty, but not always a *sufficient* condition to establish duty[;] [t]hat foreseeability alone is insufficient to establish duty does not mean that a lack of foreseeability is insufficient to establish a lack of duty").  (Emphasis in the original.)

where there is a relationship, the other factors must be considered to determine whether a duty should be imposed. Likewise, where the harm is not foreseeable, no duty can be imposed, but where the harm is foreseeable, other factors must be considered to determine whether a duty should be imposed. Before a duty can be imposed, there must be a relationship between the parties and the harm must have been foreseeable. Once it is determined that there is a relationship and that the harm was foreseeable, the burden that would be imposed on the defendant and the nature of the risk presented must be assessed to determine whether a duty should be imposed.[10]

## B. DUTY WITH REGARD TO ASBESTOS LIABILITY

Because this Court has never addressed whether property owners owe a duty to protect people who have never been on or near their property from

---

[10] Plaintiffs and Justice Cavanagh rely on the following two statements found in *Clark v Dalman,* 379 Mich 251, 261; 150 NW2d 755 (1967), "duty . . . may arise generally by operation of law under application of the basic rule of the common law, which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to unreasonably endanger the person or property of others" and "every person is under the general duty to so act, or to use that which he controls, as not to injure another." However, they read these statements out of context. First, these statements immediately follow the statement that "[a]ctionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other, and such duty must be imposed by law." *Id.* at 260-261. Although Justice Cavanagh quotes this sentence, he fails to give it any meaning. Second, the Court subsequently addressed whether a relationship existed between the parties before it concluded that a duty was owed. Therefore, contrary to plaintiffs' and Justice Cavanagh's suggestion, *Clark* does not stand for the proposition that everybody owes a duty to everybody else.

exposure to asbestos carried home on a household member's clothing, it is helpful to review the decisions of other courts that have addressed this issue.

In *CSX Transportation, Inc v Williams,* 278 Ga 888, 891; 608 SE2d 208 (2005), the Supreme Court of Georgia, answering a certified question from the United States Court of Appeals for the Eleventh Circuit, held that "an employer does not owe a duty of care to a third-party, non-employee, who comes into contact with its employee's asbestos-tainted work clothing at locations away from the workplace." That court explained:

> "'[I]n fixing the bounds of duty, not only logic and science, but policy play an important role.' However, it must also be recognized that there is a responsibility to consider the larger social consequences of the notion of duty and to correspondingly tailor that notion so that the illegal consequences of wrongs are limited to a controllable degree. The recognition of a common-law cause of action under the circumstances of this case would, in our opinion, expand traditional tort concepts beyond manageable bounds and create an almost infinite universe of potential plaintiffs. Accordingly, we decline to promulgate a policy which would extend the common law so as to bring the . . . plaintiff[s] within a class of people whose interests are entitled to protection from the defendant's conduct." [*Id.* at 890, quoting *Widera v Ettco Wire & Cable Corp,* 204 AD2d 306, 307-308; 611 NYS2d 569 (1994) (other citations omitted).][11]

In *In re New York City Asbestos Litigation,* 5 NY3d 486; 840 NE2d 115; 806 NYS2d 146 (2005), New York's highest court held that the defendant owed

---

[11] As in Michigan, "mere foreseeability was rejected by [the Georgia Supreme] Court as a basis for extending a duty of care . . . ." *CSX Transportation, supra* at 890.

11

no duty to the defendant's employee's wife, who was allegedly injured from exposure to asbestos that the employee introduced into the family home on soiled work clothes that the plaintiff wife laundered. That court explained:

> "[I]n determining whether a duty exists, courts must be mindful of the precedential, and consequential, future effects of their rulings, and limit the legal consequences of wrongs to a controllable degree" . . . . "Foreseeability, alone, does not define duty . . . ." . . . A specific duty is required because otherwise, a defendant would be subjected "to limitless liability to an indeterminate class of persons conceivably injured" by its negligent acts . . . . "Moreover, any extension of the scope of duty must be tailored to reflect accurately the extent that its social benefits outweigh its costs." [*Id.* at 493, quoting *Hamilton v Beretta USA Corp,* 96 NY2d 222, 232; 750 NE2d 1055; 727 NYS2d 7 (2001) (other citations and internal quotation marks omitted).]

The court was concerned about "limitless liability" and questioned why, if a duty was owed to an employee's spouse, a duty would not also be owed to the employee's babysitter or an employee of a neighborhood laundry. *In re New York City Asbestos Litigation, supra* at 498.

> [W]e must consider the likely consequences of adopting the expanded duty urged by plaintiffs. While logic might suggest (and plaintiffs maintain) that the incidence of asbestos-related disease allegedly caused by the kind of secondhand exposure at issue in this case is rather low, experience counsels that the number of new plaintiffs' claims would not necessarily reflect that reality. [*Id.*]

The court explained, "[T]he 'specter of limitless liability' is banished only when 'the class of potential plaintiffs to whom the duty is owed is circumscribed by the relationship.' Here, there is no relationship between the [defendant] and [the defendant's employee's wife]." *Id.*, quoting *Hamilton, supra* at 233. The court

12

held that because there was no relationship between the defendant and the defendant's employee's wife, no duty could be imposed.

In *Adams v Owens-Illinois, Inc,* 119 Md App 395; 705 A2d 58 (1998), the Maryland Court of Special Appeals held that the defendant did not owe a duty to the defendant's employee's wife who was allegedly exposed to asbestos from her husband's clothes. The court explained:

> If liability for exposure to asbestos could be premised on Mary Wild's handling of her husband's clothing, presumably Bethlehem would owe a duty to others who came in close contact with Edwin Wild, including other family members, automobile passengers, and co-workers. Bethlehem owed no duty to strangers based upon providing a safe workplace for employees. [*Id.* at 411.]

In *Zimko v American Cyanamid,* 905 So 2d 465, 482 (La App, 2005), the Louisiana Court of Appeals, "recogniz[ing] the novelty of the duty," held that the defendant owed a duty to the defendant's employee's son who was allegedly exposed to asbestos from his father's work clothes that he brought home. However, the Louisiana court relied exclusively on a New York intermediate appellate court decision that was subsequently reversed by New York's highest court. As explained by New York's highest court, "The [*Zimko*] court summarized [New York's intermediate appellate court's] decision . . . and, without providing an independent analysis, concluded that the father's employer owed a duty of care to the son." *In re New York City Asbestos Litigation, supra* at 496. Because the court in *Zimko* relied exclusively on a decision that has since been reversed, we do not find *Zimko* persuasive.

13

After New York's highest court reversed the decision by New York's intermediate appellate court in *In re New York City of Asbestos Litigation*, the Louisiana Court of Appeals reaffirmed its decision in *Zimko*. *Chaisson v Avondale Industries, Inc,* 947 So 2d 171 (La App, 2006). However, "Louisiana relies more heavily upon foreseeability in its duty/risk analysis . . . ." *Id.* at 182. Unlike Louisiana, Michigan relies more on the relationship between the parties than foreseeability in determining whether a duty exists.

In addition, in Louisiana, unlike in Michigan, "a 'no duty' defense in a negligence case is seldom appropriate," *Zimko, supra* at 482; "resolution of a negligence case based on a finding that a defendant has 'no duty' should be reserved for the exceptional situation," *id.* at 482-483, such as "cases involving 'failure to act, injuries to unborn victims, negligently inflicted mental anguish or purely economic harm unaccompanied by physical trauma to the claimant or his property,'" *id.* at 482 n 19 (citation and emphasis omitted). In Michigan, however, "[o]nly if the law recognizes a duty to act with due care arising from the relationship of the parties does it subject the defendant to liability for negligent conduct." *Friedman, supra* at 22. See also *Murdock, supra* at 53 ("Only after finding that a duty exists may the factfinder determine whether, in light of the particular facts of the case, there was a breach of the duty."). For these reasons, we do not find *Chaisson* persuasive.

In *Olivo v Owens-Illinois, Inc,* 186 NJ 394; 895 A2d 1143 (2006), the New Jersey Supreme Court held that if the defendant owed a duty to the worker, the

14

defendant owed a duty to the wife of the worker who was exposed to asbestos when she washed the clothes of her husband, who was hired by an independent contractor to perform work at the defendant's premises.[12]  However, as explained by the New York Court of Appeals, "*Olivo* is distinguishable legally in that New Jersey, unlike New York, relies heavily on foreseeability in its duty analysis."  *In re New York City Asbestos Litigation, supra* at 497.  In *Olivo, supra* at 402, the New Jersey Supreme Court described "foreseeability of harm" as """a crucial element in determining whether imposition of a duty on an alleged tortfeasor is appropriate."""  (Citations omitted.)  It further explained, "in respect of a landowner's liability, whether a duty of care can be owed to one who is injured from a dangerous condition on the premises, to which the victim is exposed off-premises, devolves to a question of foreseeability of the risk of harm to that individual or identifiable class of individuals." *Id.* at 403.  However, as explained above, Michigan, like New York, relies more on the relationship between the

---

[12] It is important to note that the court did not hold that the defendant owed the worker's wife a duty.  In fact, it held that if the defendant owed no duty to the worker, the defendant necessarily owed no duty to the worker's wife. *Olivo, supra* at 408 (If "no duty is owed to Anthony[,] . . . no derivative duty can be imposed on [defendant] for Eleanor in respect of the exposure she experienced from asbestos borne home on Anthony's work clothing.").  The court remanded the case because a question of fact existed regarding whether the defendant owed the worker a duty because the worker was an employee of an independent contractor.

parties than foreseeability of harm when determining whether a duty exists.[13]  For

this reason, we do not find *Olivo* persuasive.[14]

## C. APPLICATION TO THIS CASE

As explained above, under Michigan law, the ultimate inquiry in

determining whether a legal duty should be imposed is whether the social benefits

of imposing a duty outweigh the social costs of imposing a duty.  The inquiry

involves considering, among any other relevant considerations: "'the relationship

of the parties, the foreseeability of the harm, the burden on the defendant, and the

nature of the risk presented.'"  *Dyer, supra* at 49 (citations omitted).

In the instant case, the relationship between Miller and defendant was

highly tenuous-- defendant hired an independent contractor who hired Roland who

---

[13] We recognize that New York law differs from Michigan law in that New York does not consider foreseeability at all in determining whether a duty should be imposed, while we do give some consideration to this factor.  See *In re New York City Asbestos Litigation, supra* at 494 ("foreseeability bears on the scope of a duty, not whether a duty exists in the first place").

[14] For the same reason, the California Court of Appeals decision in *Condon v Union Oil Company of California,* 2004 Cal App Unpub LEXIS 7975 (Cal App, 2004), is not persuasive.  The court in that case relied exclusively on the forseeability factor.  It stated, "Since it was known that a worker's clothing could be a source of contamination to others, then it was foreseeable that family members who were exposed to this clothing would also be in danger of being exposed."  *Id.* at *13.  In addition, *Satterfield v Breeding Insulation Co, Inc,* 2007 Tenn App LEXIS 230, *25 (Tenn App, 2007), which held that the defendant employer could be liable for the plaintiff's injuries caused by asbestos being taken home on her father's clothes, is not persuasive because "[i]n Tennessee, [unlike in Michigan,] 'the foreseeability prong [of the balancing test] is paramount because "foreseeability is the test of negligence."'"  (Citations omitted.)

lived in a house with Miller, his stepdaughter, who sometimes washed his clothes.[15] Miller had never been on or near defendant's property and had no further relationship with defendant. Therefore, the "relationship between the parties" prong of the duty test, which is the most important prong in this state, strongly suggests that no duty should be imposed.[16]

---

[15] Although Justice Cavanagh attempts to downplay the importance of the relationship prong, he is unable to cite a single decision in which this Court has found that a duty existed where a relationship did not exist. Moreover, it is noteworthy that, although Justice Cavanagh does not dispute that relationship, or lack thereof, constitutes a factor that must be considered, he says nothing at all about the relationship, or lack thereof, between Miller and the defendant in this case, other than a conclusory statement that there was a relationship between Roland and defendant and that such a relationship should "extend[]" to Miller. *Post* at 6.

[16] Plaintiffs rely on *Shepard v Redford Community Hosp*, 151 Mich App 242; 390 NW2d 239 (1986). In *Shepard,* the plaintiff went to the defendant hospital and was diagnosed as suffering from an upper respiratory problem. In fact, the plaintiff was suffering from spinal meningitis. The plaintiff's son became infected with spinal meningitis and died. The Court of Appeals held that the defendant hospital owed the plaintiff's son a duty because it had a physician-patient relationship with the plaintiff. *Shepard* is distinguishable from the instant case because in *Shepard* there was a physician-patient relationship between the plaintiff mother and the defendant, while in the instant case there was not even an employer-employee relationship between the stepfather and defendant. Because *Shepard* is distinguishable, we do not need to address whether it was decided correctly; however, we do note that the Court of Appeals concluded that a duty was owed based solely on the existence of a relationship. See *Shepard, supra* at 246 ("Because defendant had a special relationship with plaintiff, we conclude that defendant owed a duty of reasonable care to [plaintiff's son]"). As we explained above, although the nonexistence of a relationship precludes the imposition of a duty, the existence of a relationship does not require the imposition of a duty. Instead, where the existence of a relationship is found, the other factors must be considered before a duty can be imposed.

The "burden [that would be imposed] on the defendant" prong also suggests that no duty should be imposed because protecting every person with whom a business's employees and the employees of its independent contractors come into contact, or even with whom their clothes come into contact, would impose an extraordinarily onerous and unworkable burden.[17]

---

[17] Justice Cavanagh contends that "the potential burden must be examined *in this limited context*, not extrapolated to all other imaginable potential litigants." *Post* at 7 (emphasis added). He contends further that this question "should also be viewed in the extremely narrow confines of this particular case." *Post* at 12. However, this is not how a court of law properly determines the existence, or nonexistence, of a legal duty, for such a determination will apply not only in the instant case but in the next 500 cases as well. One cannot assess "social benefits" and "social costs" by considering only a "particular" case or without considering other "potential litigants." Unlike Justice Cavanagh, we refuse to consider whether to impose a new legal duty without regard to the consequences of such a decision for future cases. As New York's highest court explained:

> Plaintiffs assure us that this will not lead to "limitless liability" because the new duty may be confined to members of the household of the employer's employee, or to members of the household of those who come onto the landlord's premises. This line is not so easy to draw, however. For example, an employer would certainly owe the new duty to an employee's spouse (assuming the spouse lives with the employee), but probably would not owe the duty to a babysitter who takes care of children in the employee's home five days a week. But the spouse may not have more exposure than the babysitter to whatever hazardous substances the employee may have introduced into the home from the workplace. Perhaps, for example, the babysitter (or maybe an employee of a neighborhood laundry) launders the family members' clothes. In short, as we pointed out in *Hamilton*, the "specter of limitless liability" is banished only when "the class of potential plaintiffs to whom the duty is owed is circumscribed by the

(continued…)

18

Given what we know about asbestos today, i.e., that there is a causal relationship between exposure to asbestos and mesothelioma, and assuming that defendant directed the independent contractor to work with asbestos-containing materials, the "nature of the risk" was serious. Therefore, the "nature of the risk" prong suggests that a duty should be imposed.

However, the "foreseeability of the harm" prong suggests that no duty should be imposed. From 1954 to 1965, the period during which Roland worked at defendant's plant, we did not know what we know today about the hazards of asbestos. See *Exxon Mobil Corp v Altimore,* 2007 Tex App LEXIS 2971 (Tex App, 2007) (holding that because the Occupational Health and Safety Administration did not promulgate regulations prohibiting employers from allowing workers who had been exposed to asbestos to wear their work clothes home until 1972, the risk of "take home" asbestos exposure was not foreseeable to Exxon Mobil before 1972, and, thus, Exxon Mobil did not owe a duty to the

---

(…continued)

> relationship." [*In re New York City Asbestos Litigation, supra* at 498, quoting *Hamilton, supra* at 233.]

Unlike Justice Cavanagh, the New York plaintiffs at least recognized that their burden in urging the creation of a new duty required an assessment of the consequences arising from such a duty for future cases. Moreover, Justice Cavanagh fails to offer any principled way of distinguishing the claims of household members from other potential claimants-- for instance, a person who sat next to Roland on the bus every day after work-- based on "the social benefit of a healthy people." *Post* at 21.

19

plaintiff, who was allegedly exposed to asbestos brought home on her husband's clothes from 1942 to 1972). Further, plaintiffs' own expert conceded that the first published literature suggesting a "specific attribution to washing of clothes" was not published until 1965. Joint Appendix at 897a. Therefore, the risk of "take home" asbestos exposure was, in all likelihood, not foreseeable by defendant while Roland was working at defendant's premises from 1954 to 1965.[18]

Because the ultimate inquiry in determining whether a duty should be imposed involves balancing the social benefits of imposing a duty with the social costs of imposing a duty, we cannot decide whether a duty should be imposed without "assessing the competing policy considerations . . . ." *Friedman, supra* at 22. We must be "concerned with whether it is appropriate public policy to impose

---

[18] Justice Cavanagh criticizes us for relying on *Altimore* rather than on "the evidence produced at trial." *Post* at 8. However, he fails to point to *any* "evidence produced at trial" that suggests that the harm was foreseeable. He states that "the transcripts are repeatedly cut off during what appears to be testimony shedding further light on the question of foreseeability." *Post* at 11. If there are missing pages to the transcript that contain "testimony shedding further light on the question of foreseeability," plaintiffs obviously could have included those pages. This is a matter for the Fourteenth District Court of Appeals of Texas, not this Court. That court has certified a question of law and we have answered that question of law on the basis of the information that has been presented to us.

Also, contrary to Justice Cavanagh's contention, it should come as no surprise to the parties that we are addressing foreseeability given that it is well-established law in Michigan that foreseeability is a factor to be considered in determining whether a legal duty should be imposed. Nevertheless, "other considerations may be, and usually are, more important." *Buczkowski, supra* at 101.

liability . . . ." *Smith, supra* at 716 n 24. "'"[I]n fixing the bounds of duty, not only logic and science, but policy play an important role."'" *CSX Transportation, supra* at 890, quoting *Widera, supra* at 307 (other citations omitted). "'[T]here is a responsibility to consider the larger social consequences of the notion of duty and to correspondingly tailor that notion so that the illegal consequences of wrongs are limited to a controllable degree.'" *CSX Transportation, supra* at 890, quoting *Widera, supra* at 307. "'[I]n determining whether a duty exists, courts must be mindful of the precedential . . . effects of their rulings, and limit the legal consequences of wrongs to a controllable degree.'" *In re New York City Asbestos Litigation, supra* at 493, quoting *Hamilton, supra* at 232 (other citations and internal quotation marks omitted). "'Moreover, any extension of the scope of duty must be tailored to reflect accurately the extent that its social benefits outweigh its costs.'" *Id.*

As the United States Supreme Court has recognized, this country is experiencing an "asbestos-litigation crisis" as a result of the "'elephantine mass of asbestos cases' lodged in state and federal courts . . . ." *Norfolk & W R Co v Ayers,* 538 US 135, 166; 123 S Ct 1210; 155 L Ed 2d 261 (2003) (citation omitted). Asbestos claims have given rise to one of the most costly products-liability crises ever within our nation's legal system. "Asbestos claims continue to pour in at an extraordinary rate [and] scores of employers have been forced into bankruptcy." Behrens & Cruz-Alvarez, *A potential new frontier in asbestos litigation: Premises owner liability for "take home" exposure claims*, 21 Mealey's

Litig Rep Abs 1, 4 (2006). Some commentators have said that "[b]efore it ends, the litigation may cost up to $195 billion — on top of the $70 billion spent through 2002." *Id.* These same commentators have explained:

> Premises owner liability for "take home" exposure injuries represents the latest frontier in asbestos litigation. These actions clearly involve highly sympathetic plaintiffs. Yet, as several leading courts have appreciated, the law should not be driven by emotion or mere foreseeability. Broader public policy impacts must be considered, including the very real possibility that imposition of an expansive new duty on premises owners for off-site exposures would exacerbate the current "asbestos-litigation crisis." Plaintiffs' attorneys could begin naming countless employers directly in asbestos and other mass tort actions brought by remotely exposed persons such as extended family members, renters, house guests, carpool members, bus drivers, and workers at commercial enterprises visited by the worker when he or she was wearing dirty work clothes . . . .
>
> Furthermore, adoption of a new duty rule for employers could bring about a perverse result: nonemployees with secondary exposures could have greater rights to sue and potentially reap far greater recoveries than employees. Namely, secondarily exposed nonemployees could obtain noneconomic damages, such as pain and suffering, and possibly even punitive damages; these awards are not generally available to injured employees under workers' compensation. [*Id.* at 5.]

In *Henry v Dow Chemical Co,* 473 Mich 63; 701 NW2d 684 (2005), this Court held that mere exposure to a negligently released dioxin, a synthetic chemical that is potentially hazardous to human health, does not give rise to a negligence action. We explained:

> [W]e have on occasion allowed for the development of the common law as circumstances and considerations of public policy have required. But as Justice Young has recently observed, our common-law jurisprudence has been guided by a number of prudential principles. See Young, *A judicial traditionalist confronts*

*the common law*, 8 Texas Rev L & Pol 299, 305-310 (2004). Among them has been our attempt to "avoid capricious departures from bedrock legal rules as such tectonic shifts might produce unforeseen and undesirable consequences," *id.* at 307, a principle that is quite applicable to the present case.

> Plaintiffs have asked us to recognize a cause of action that departs drastically from our traditional notions of a valid negligence claim.[19] Beyond this enormous shift in our tort jurisprudence, judicial recognition of plaintiffs' claim may also have undesirable effects that neither we nor the parties can satisfactorily predict. For example, recognizing a cause of action based solely on exposure— one without a requirement of a present injury—would create a potentially limitless pool of plaintiffs. [*Id.* at 83 (citations and emphasis omitted).]

Just as recognizing a cause of action based solely on exposure would create a potentially limitless pool of plaintiffs, so too would imposing a duty on a landowner to anybody who comes into contact with somebody who has been on the landowner's property. "We would be unwise, to say the least, to alter the common law in the manner requested by plaintiffs when it is unclear what the consequences of such a decision may be and when we have strong suspicions . . . that they may well be disastrous." *Id.* at 88 (citation omitted). "The recognition of a common-law cause of action under the circumstances of this case would, in our opinion, expand traditional tort concepts beyond manageable bounds and create an

---

[19] In response to the "asbestos-litigation crisis," this Court adopted an administrative order precluding trial courts from "'bundling' asbestos-related cases for settlement or trial." Administrative Order No. 2006-6, 476 Mich xliv. One of the purposes of this order was to ensure that asbestos litigants are subject to traditional legal standards. Therefore, it would be inconsistent for us now to suggest that traditional legal standards should not apply to asbestos litigants.

almost infinite universe of potential plaintiffs.[20]   Accordingly, we decline to

promulgate a policy which would extend the common law so as to bring the . . .

plaintiff[s] within a class of people whose interests are entitled to protection from

the defendant's conduct." *CSX Transportation, supra* at 890 (citation omitted).[21]

---

[20] Justice Cavanagh would impose a duty here because the social benefit of compensating somebody for a loved one's death is "tremendous." *Post* at 15. We certainly do not quarrel with him in this characterization. However, we do not believe that this automatically allows courts to ignore the social costs of imposing a duty. Although every death, or serious injury, is indeed "tremendous," this is no warrant for placing responsibility upon an inappropriate defendant. Not every death or serious injury, however genuinely "tremendous," is legally compensable by someone else. Under Justice Cavanagh's approach, no matter how attenuated or remote the relationship between parties, if a plaintiff has suffered a death, or presumably any kind of serious injury, he or she would prevail. This is simply not the law in Michigan or in any other state. Nor could it be the law in any reasonably functioning society that desires that its resources be devoted to something other than litigation. Justice Cavanagh would impose liability here because Carolyn Miller died. One need not fail to recognize the gravity of this occurrence to recognize that additional analysis is required under traditional legal rules.

[21] Plaintiffs and Justice Cavanagh rely heavily on *Olivo, supra* at 405, which held that any duty owed to the members of a worker's household constitutes a "derivative duty," i.e., one derived from the duty owed to the worker himself. Thus, even under *Olivo,* no duty is owed to a worker's household members unless a duty is owed to the worker himself. Justice Cavanagh, however, concludes that defendant owed Miller a duty without considering whether defendant owed Roland a duty. Because Roland was an employee of an independent contractor, defendant would have owed him a duty under Michigan law only if it could be shown that the "common work area" doctrine was satisfied *and* that defendant "retained control" over the work being performed. *Ormsby v Capital Welding, Inc,* 471 Mich 45, 55; 684 NW2d 320 (2004). To our knowledge, there was no evidence presented establishing the "'unusually high degree of control'" over the relining projects required by *Ormsby, supra* at 55 (citation omitted). Indeed, the jury instructions given on this point seem inconsistent with Michigan law.

(continued…)

24

Finally, plaintiffs argue that under the "inherently dangerous activity" doctrine, property owners may owe a duty to somebody who has never been on their property even where they do not owe a duty to their own employees or the employees of an independent contractor that they have hired. Plaintiffs are correct that under the "inherently dangerous activity" doctrine, property owners may owe a duty to a person who has never been on their property even though they owe no duty to their employees or the employees of their independent contractors. *DeShambo v Anderson,* 471 Mich 27, 38; 684 NW2d 332 (2004). However, the "inherently dangerous activity" doctrine is not at all applicable to the instant case. "[U]nder this doctrine, the landowner must itself owe some duty to the specific third party, . . . the negligent act that causes the injury cannot be collateral to the work contracted for, and . . . the injury that occurs must be reasonably expected by the landowner." *Id.* at 34.

First, for the reasons discussed above, defendant owed no duty to Miller. In addition, the "inherently dangerous activity" doctrine only applies to persons on the defendant's property, passing by the property, or on neighboring property. See *Detroit v Corey,* 9 Mich 165 (1861) (a passerby fell into a ditch); *Darmstaetter v Moynahan,* 27 Mich 188 (1873) (a passerby ran into a wall of ice); *McWilliams v*

---

(…continued)

However, given that we conclude that defendant owed no duty to Miller regardless of whether defendant owed a duty to Roland, it is not necessary for us to decide whether defendant owed a duty to Roland.

25

*Detroit Central Mills Co,* 31 Mich 274 (1875) (a passerby was run over by a railroad car); *Rogers v Parker,* 159 Mich 278; 123 NW 1109 (1909) (a fire spread to neighboring land); *Inglis v Millersburg Driving Ass'n,* 169 Mich 311; 136 NW 443 (1912) (a fire spread to the plaintiff's adjoining land); *Olah v Katz,* 234 Mich 112; 207 NW 892 (1926) (a neighboring child fell in a hole); *Wight v H G Christman Co,* 244 Mich 208; 221 NW 314 (1928) (sparks from a steam shovel started an adjacent house on fire); *Watkins v Gabriel Steel Co,* 260 Mich 692; 245 NW 801 (1932) (a worker fell from third story as a result of improperly fastened steel joists); *Tillson v Consumers Power Co,* 269 Mich 53; 256 NW 801 (1934) (excavation on property caused damage to an adjacent property); *Grinnell v Carbide & Carbon Chemicals Corp,* 282 Mich 509; 276 NW 535 (1937) (a boat exploded, seriously injuring its passengers); *Barlow v Krieghoff Co,* 310 Mich 195; 16 NW2d 715 (1944) (a child fell into a bucket of hot tar on an adjacent lot); *McDonough v Gen Motors Corp,* 388 Mich 430; 201 NW2d 609 (1972) (a boom fell on a worker); see also *DeShambo, supra,* at 33 ("""[A] man who orders a work to be executed, from which, in the natural course of things, injurious consequences *to his neighbor* must be expected to arise, unless means are adopted by which such consequences may be averted, is bound to see the doing of that which is necessary to prevent mischief, and cannot relieve himself of his responsibility by employing some one else.""") (citations omitted; emphasis in the original); Prosser & Keeton, Torts (5th ed), § 71, p 514 (inherently dangerous activity doctrine is limited to activity that poses a "specific risk or set of risks to *those in the vicinity*")

(emphasis added). The "inherently dangerous activity" doctrine has never been applied to extend a property owner's duty to somebody completely disconnected from the property.[22]

Second, "the negligent act that causes the injury cannot be *collateral* to the work contracted for . . . ." *DeShambo, supra* at 34 (emphasis added). Here, the work contracted for was the relining of blast furnaces. Plaintiffs argue that defendant was negligent in providing the workers with materials that contained asbestos. This allegedly negligent act-- providing unsafe materials-- was "collateral" to the work contracted for-- the relining of the blast furnaces.

Finally, "the injury that occurs must be reasonably expected by the landowner." *Id.* at 34. As discussed above, the risk of "take home" asbestos exposure, in all likelihood, was not reasonably expected by defendant while Roland was working at defendant's plant from 1954 to 1965. For these reasons, the "inherently dangerous activity doctrine" does not apply here.

_____

[22] Further, the "inherently dangerous activity" doctrine only applies to non-delegable duties. *DeShambo, supra* at 34 (the inherently dangerous activity doctrine is "founded on the existence of a duty on behalf of the landowner, or employer of an independent contractor, and the duty must be of the type that is nondelegable"). The removal of asbestos containing materials is certainly not a nondelegable duty. Otherwise, a homeowner who hired a person to remove asbestos from his house could be held liable to somebody who that person exposed to asbestos. This cannot be the case. Homeowners must be able to delegate this duty to professionals who are specifically trained in removing asbestos without fear of liability.

## IV. CONCLUSION

In Michigan, "the question whether the defendant owes an actionable legal duty to the plaintiff is one of law which the court decides after assessing the competing policy considerations for and against recognizing the asserted duty." *Friedman, supra* at 22. The social benefits of imposing a duty must outweigh the social costs of doing so. The inquiry involves considering, among any other relevant considerations: "'the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented.'" *Dyer, supra* at 49, quoting *Murdock, supra* at 53, citing *Buczkowski, supra* at 100. However, the most important factor pertains to the relationship between the parties. Because any relationship between Miller and defendant was highly tenuous, the harm was, in all likelihood, not foreseeable, the burden on defendant would be onerous and unworkable, and the imposition of a duty, under these circumstances, would "'expand traditional tort concepts beyond manageable bounds and create an almost infinite universe of potential plaintiffs,'" *CSX Transportation, supra* at 890 (citation omitted), we conclude that a legal duty should not be imposed. For these reasons, we answer the certified question in the negative. That is, we hold that, under Michigan law, defendant, as owner of the property on which asbestos-containing products were located, did not owe to the deceased, who was never on or near that property, a legal duty to protect her from exposure to any asbestos fibers carried home on the clothing of a member of her household who was working on that property as the employee of independent

28

contractors, where there was no further relationship between defendant and the deceased. Having answered the certified question, we now return the matter to the Fourteenth District Court of Appeals of Texas for such further proceedings as that court deems appropriate.

Stephen J. Markman
Clifford W. Taylor
Maura D. Corrigan
Robert P. Young, Jr.

STATE OF MICHIGAN

SUPREME COURT

*In re* CERTIFIED QUESTION FROM
THE FOURTEENTH DISTRICT COURT
OF APPEALS OF TEXAS.
_____

GLENN MILLER, ESTATE OF CAROLYN
MILLER, SHAWN DEAN, JOHN
ROLAND, and ALMA ROLAND,

      Plaintiffs,

v                                      No. 131517

FORD MOTOR COMPANY,

      Defendant.
_____

CAVANAGH, J. (*dissenting*).

      I dissent from the majority opinion because I do not believe that this Court

should substantively decide this appeal. In fact, without the participation of

Justice Young, who strongly believes that this Court lacks the constitutional

authority to answer the certified question,[1] this Court would not have answered

_____

     [1] See *In re Certified Question (Veliz v Cintas Corp)*, 474 Mich 1228 (2006)
(Young, J., concurring); *In re Certified Question (Melson v Prime Ins Syndicate, Inc)*, 472 Mich 1225 (2005) (Young, J., concurring).

the question. I would point out the curiosity that Justice Young's constitutional conscience would allow him to subordinate his deeply held belief to provide the fourth vote to answer the question in this case. Despite the fact that he has participated in answering certified questions before, the fact remains that had he not provided the deciding vote to answer *this* certified question, he would have caused the Court not to answer the question, which surely would have aligned much better with his view against providing a foreign court with a "didactic exegesis on our law" than answering it. See *In re Certified Question (Veliz v Cintas Corp)*, 474 Mich 1228 (2006) (Young, J., concurring). This situation differs from the previous cases in which Justice Young participated because in those cases, there were enough votes to answer the question regardless of his participation. In other words, his vote in those cases had no impact on the fact that the question was answered.[2]

In any event, I further disagree that Michigan law compels the result the majority reaches. Contrary to the majority's conclusion, defendant could be found to owe a duty to Carolyn Miller with respect to asbestos contamination through take-home exposure. Regarding our role in this case, it is my view that

---

[2] Compare this to *Melson*, *supra*, wherein Justice Young could have provided, but did not provide, the fourth vote to answer the question. Thus, I fail to see the same laudability of this inconsistent and unpredictable behavior that Justice Markman does. See *ante* at 3 n 2.

2

the question certified to us by the Texas court improperly asks us to decide the specific case pending before that court. The Texas court asked

> [w]hether, under Michigan law, Ford, as owner of property on which asbestos-containing products were located, owed to Carolyn Miller, who was never on or near that property, a legal duty specified in the jury charge submitted by the trial court, to protect her from exposure to any asbestos fibers carried home on the clothing of a member of Carolyn Miller's household who was working on that property as the employee of an independent contractor.

By this wording, the Texas court has asked this Court to decide the case without the benefit of examining it on direct appeal under an applicable standard of review. Moreover, in my view, this state's well-developed negligence precedents would enable the Texas court to decide the case before it without resort to an advisory opinion or a substantive decision from this Court.

The answer to the Texas court's formulation of the certified question depends on the intricacies of this specific case, and because of these complexities I would decline to answer the question. I do not believe that we should entangle ourselves in an appeal pending in another state by determining whether this defendant owed a duty to Carolyn Miller. If anything, we should be determining only whether Michigan law would permit the Texas court to hold that defendant owed a duty to Carolyn Miller. But by deciding the case, this Court oversteps its advisory role and decides issues of fact without the benefit of full review.

However, because the majority decides the case, I must register my disagreement with its analysis. Contrary to the majority's position, I would hold that a duty can be imposed in the present case. I am guided first and foremost by

traditional principles of negligence set forth by this Court in *Clark v Dalman*, 379 Mich 251, 260-261; 150 NW2d 755 (1967):

> Actionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other, and such duty must be imposed by law. The duty may arise specifically by mandate of statute, or it may arise generally by operation of law under application of the basic rule of the common law, *which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to unreasonably endanger the person or property of others. This rule of the common law arises out of the concept that every person is under the general duty to so act, or to use that which he controls, as not to injure another. Pinnix* v. *Toomey*, (1955), 242 NC 358, 362 (87 SE2d 893).

> Such duty of care may be a specific duty owing to the plaintiff by the defendant, or it may be a general one owed by the defendant to the public, of which the plaintiff is a part. [Emphasis added.]

The majority ignores these fundamental principles, and I do not find its attempt to diminish their import, *ante* at 10 n 10, persuasive. Further, the majority misstates other aspects of Michigan law. For instance, although the majority spends considerable time opining that, in a duty analysis, "[t]he most important factor to be considered is the relationship of the parties," *ante* at 6, 16-17, this is not a bright-line rule in this state, and it is not true in every factual situation. In *Buczkowski v McKay*, 441 Mich 96, 101; 490 NW2d 330 (1992), this Court recognized that "[c]ourts take a variety of approaches in determining the existence of a duty, utilizing a wide array of variables in the process. Frequently, the first component examined by the court is the foreseeability of the risk. However, other considerations may be, and usually are, more important."

4

The fact that the relationship between the parties is a component of a duty analysis and may, at times, be given more weight than another of the components certainly does not mean that the relationship is the most important inquiry.[3] How heavily to weigh each of the several factors depends on the precise situation at hand.[4]

Many variables are considered in a duty analysis. As the *Buczkowski* Court noted:

> Dean Prosser described the several variables that consistently go to the heart of a court's determination of duty as including: foreseeability of the harm, degree of certainty of injury, closeness of connection between the conduct and injury, moral blame attached to the conduct, policy of preventing future harm, and, finally, the burdens and consequences of imposing a duty and the resulting liability for breach. [*Id.* at 101 n 4, quoting Prosser & Keeton, Torts (5th ed), § 53, p 359 n 24.]

Each of these factors is significant, and the majority incorrectly represents the law in this state by asserting that the relationship between the parties is the most important. Only by subordinating these factors to that of relationship is the majority able to discount every opinion of another state in which a duty was found with respect to take-home exposure.

---

[3] It should be noted that in *Buczkowski*, the nature of the injured person's claim involved the criminal act of a third party. Here, no third-party conduct is involved. The analysis, therefore, will not be identical to that in *Buczkowski*.

[4] For a recent case in which the relationship of the parties was hardly mentioned but in which foreseeability was this same majority's paramount focus, see *Brown v Brown*, 478 Mich ___; ___ NW2d ___ (Docket No. 270689, decided July 11, 2007).

With respect to relationship, the majority states that because Carolyn Miller was never "on or near defendant's property," the relationship prong "certainly suggests that no duty should be imposed." *Ante* at 17. But the majority's severely curtailed view of "relationship" seems to be based on its view of premises liability law rather than on the principles of ordinary negligence. Under the latter (and the former as well, although that is not at issue here), a harmed person need not visit the property of the injuring party. This case involves an employer who exposed a worker to asbestos, knowing that the asbestos fibers were toxic and could be carried home, thus exposing the worker's family to asbestos. Under these circumstances, I have no difficulty concluding that the relationship—that a jury found defendant had to Cleveland "John" Roland—extended to Carolyn Miller. To conclude otherwise, as does the majority, ignores basic negligence principles and gives employers carte blanche to expose workers to communicable toxic substances without taking any measure whatsoever to prevent those substances from harming others. This I cannot do. Indeed, as discussed later in this dissent, our government also refuses to grant this free pass.

Moreover, I disagree that the burden defendant would bear by shouldering a duty with respect to Carolyn Miller is so great that innocent people must suffer without recourse. Our federal government has stated that it "is aware of no instance in which exposure to a toxic substance has more clearly demonstrated detrimental health effects on humans than has asbestos exposure." 51 Fed Reg

6

22615 (1986). In assessing whether defendant should have a duty, I would find that the extreme toxicity of asbestos weighs heavily in favor of finding that defendant had a duty to protect those whom defendant put at risk by exposing them to it.

The majority also seriously overstates what the consequences of imposing a burden on defendant would truly be by asserting that, if a duty were imposed, businesses would have to "protect[] every person with whom a business's employees and the employees of its independent contractors come into contact, or even with whom their clothes come into contact . . . ." *Ante* at 18. That is incorrect. The certified question is specific to this case in that it asks whether this defendant should be found to have a duty owed to Carolyn Miller. Thus, the potential burden must be examined in this limited context, not extrapolated to all other imaginable potential litigants.[5] And again, as will be discussed in this dissent, defendant now has a regulatory duty to minimize the potential for take-home exposure. Thus, holding that defendant had a duty to this particular person

---

[5] In response to the majority, *ante* at 18 n 17, I did not write the certified question. The Texas appellate court wrote the certified question, and it wrote it in probably the most specific way possible. The majority oversteps the bounds of the question by considering factors that are not at issue in this case. And there is nothing novel about deciding the legal question of duty as it pertains to a particular set of parties. Although duty is a question of law, it will always be answered in the context of a unique set of circumstances. The factors used in a duty analysis make that clear; for instance, the relationship of *these* parties and whether the harm was foreseeable to *this* defendant are considered.

7

would not impose nearly the burden the majority claims. Questions of duty specifically entail drawing lines, and under a properly tailored rule, the duty could be appropriately limited. Thus, the majority mischaracterizes the burden and concludes, on the basis of unwarranted extremism, that the burden is too great. I would not conclude that the burden of imposing a duty on defendant, whose actions led to Carolyn Miller's exposure to a toxic substance, would be too large to bear.

I further take issue with the majority's conclusion regarding foreseeability. In its analysis, the majority commits three errors. First, it reasons that because foreseeability was not found with respect to Exxon Mobil in *Exxon Mobil Corp v Altimore*, unpublished opinion of the Texas Court of Appeals, issued April 19, 2007 (Docket No. 14-04-01133-CV), "the risk of 'take home' asbestos exposure was, in all likelihood, not foreseeable by defendant while [John] Roland was working at defendant's premises from 1954 to 1965." *Ante* at 20. But the *Altimore* court based its holding on the evidence produced at trial, as it should have. See *Altimore*, *supra*, 2007 Tex App LEXIS 2971 at *36. This Court's conclusion, too, should be based on the evidence produced at trial. It is improper for this majority to rely on another court's holding to determine whether this defendant in the present case knew or should have known of the risk.

It may be of interest to the reader that in a different case involving Exxon Mobil, the evidence showed that Exxon Mobil was fully aware of the possibility of take-home exposure:

8

> Exxon Mobil was aware by 1937 that exposure, of sufficient duration and intensity, to asbestos dust or raw asbestos was associated with asbestosis. Moreover, a report prepared in 1937 specifically for the petroleum industry, detailed the hazards associated with "occupational dust," including asbestos particles, which was prevalent at petroleum plants. [*Olivo v Owens-Illinois, Inc*, 186 NJ 394, 404; 895 A2d 1143 (2006).]

The majority's mention of only the case in which Exxon was not found to know of the risk is curious.

It is also worth noting that it has not proved unusual to find that an employer knew or should have known about the risk of take-home exposure at the times relevant to this case. In *Condon v Union Oil Co of California*, unpublished opinion of the California Court of Appeals, issued August 31, 2004 (Docket No. A102069), the court relied on expert testimony indicating that

> in 1924 in the United States, it was recognized that workers handling toxic substances should have separate lockers for work and street clothes to prevent their families from being exposed to any toxic dust from the workers' clothes. [The expert] testified that in 1948, a leading industrial hygienist in the oil industry recommended that refinery workers change clothes prior to going home, and that the refinery launder the work clothes to avoid contaminating the worker's home with carcinogenic materials. [*Condon, supra,* 2004 Cal App Unpub LEXIS 7975 at *13.]

In any event, it should be self-evident that a finding regarding foreseeability must be based on the evidence specific to a particular case. And here, plaintiffs presented evidence, which the jury clearly believed, that this defendant knew of the hazards of asbestos at the relevant times. The focus should be on what this defendant knew, not on what Exxon Mobil was found to know in *Altimore*. By ascribing no weight to the evidence that plaintiffs

9

produced at trial and relying on another court's findings regarding the evidence produced at a different trial involving a different defendant, the majority upends the jury's finding and improperly decides a factual matter.

Nor should the analysis hinge on what date the first literature connecting take-home exposure with clothes washing was published, the majority's second error. See *ante* at 23-24 ("[P]laintiffs' own expert conceded that the first published literature suggesting a 'specific attribution to washing of clothes' was not published until 1965."). And defendant asserts that no foreseeability can be found before 1972—the year the Occupational Safety and Health Administration (OSHA) began regulating the taking home of clothing exposed to asbestos. But research on the dangers of exposure to asbestos had been going on for decades, and warnings appeared far earlier. In fact, "[a]s early as 1916, industrial hygiene texts recommended that plant owners should provide workers with the opportunity to change in and out of work clothes to avoid bringing contaminants home on their clothes." *Olivo*, *supra* at 404. The question is not what year literature was published regarding the dangers of washing contaminated clothing or what year OSHA instituted regulations. Neither of those dates is dispositive if it can be shown, which it apparently was, that defendant had some other source of knowledge and information at the relevant time. Consequently, were the foreseeability inquiry properly conducted and limited to the evidence produced at this trial, this factor might have weighed in plaintiffs' favor.

Importantly, though, and this pertains to the majority's third error, the question of foreseeability is a question addressable only on full appellate review, of which we do not have the benefit. First, there is no stated standard of review under which to substantively review the jury's findings for correctness. Further, the parties have not submitted the entire trial transcript, but instead have provided only excerpts. While the portions that have been submitted contain some of plaintiffs' expert's testimony regarding what defendant knew and what information was available to defendant, the transcripts are repeatedly cut off during what appears to be testimony shedding further light on the question of foreseeability.[6] Thus, a proper review of whether this defendant knew of the

_____

[6] The majority asserts that because the transcripts do not contain the full discussion of foreseeability that occurred at trial, evidence regarding defendant's knowledge of the dangers of exposing workers to asbestos must not exist. *Ante* at 20 n 18. I find this an extremely backward way to go about the analysis. First, I must mention again that *the jury found foreseeability*. I would not surmise, as does the majority, that this finding was based on nothing. The majority must believe that the jury was either unintelligent or deliberately failed to follow the jury instructions. I find both conclusions insulting and refuse to make them. Further, there is a perfect explanation of why the parties did not include the entire transcript: *this Court was not supposed to factually redecide the issue of foreseeability*. Rather, this Court should, if anything, consider what was found about foreseeability in the course of weighing the duty factors. The difference between weighing *the jury's finding* with respect to foreseeability in the duty analysis and reaching its *own* factual conclusions about foreseeability is a critical difference the majority fails to grasp. See *ante* at 20 n 18.

The majority is free to thoroughly review the trial testimony excerpts as I have done. On doing so, it would indeed find numerous instances of testimony that support the jury's findings. The record is far from devoid of such evidence.

(continued…)

11

risks posed by take-home exposure is impossible for this Court to conduct, and the majority errs by nevertheless conducting it. This is yet another reason why it is both irregular and improper for this Court to substantively decide this case.

Moving on, I differ greatly with the majority regarding the outcome of what it deems the "ultimate inquiry": "whether the social benefits of imposing a duty outweigh the social costs of imposing a duty." *Ante* at 20. First, this question should also be viewed in the extremely narrow confines of this particular case. Specifically, the Texas court has asked whether this defendant had a duty to Carolyn Miller. Holding that this defendant had a duty to Carolyn Miller would not create a universal cause of action for every potential take-home exposure case. Thus, the majority needlessly invokes the sky-is-falling genre of arguments advanced by commentators who have been openly critical of asbestos litigation and tort recovery in general. See *ante* at 21-22. Quite simply, there has

---

(…continued)

But I cannot in good conscience render a definitive conclusion regarding foreseeability for the mere fact that the transcript is incomplete.

The fact that the majority believes that other factors are more important than foreseeability, *ante* at 20 n 18, does not mitigate the fact that the majority decides the question of foreseeability using an incorrect process. Moreover, I do not see anything left for the Texas court's determination, contrary to the majority's statement that "[t]his is a matter for the Texas Court of Appeals, not this Court." *Id.* In my reading, the majority decides that the risk was not foreseeable to defendant. See *id.* However, because this Court's answer to a certified question is purely advisory and does not constitute binding precedent, the Texas court is free to draw its own conclusions with respect to the meaning, or applicability, of the majority opinion.

been no showing in this case that were defendant found to have a duty, "a potentially limitless pool of plaintiffs" or "'an almost infinite universe of potential plaintiffs'" would be created. *Ante* at 23-24 (citation omitted). In fact, one of the very commentators the majority quotes recently wrote that "after years of downward spiral, the asbestos litigation tide finally may be turning." Behrens & Goldberg, *The asbestos litigation crisis: The tide appears to be turning*, 12 Conn Ins L J 477, 478 (2006).[7]

And several courts have adequately addressed the majority's concern with reasoning I find persuasive. One explained that the public policy concerns would "dissipate" because it was only recognizing a duty based on "the particularized foreseeability of harm to plaintiff's wife, who ordinarily would perform typical household chores that would include laundering the work clothes worn by her husband." *Olivo*, *supra* at 405. Another recognized that a rule could be properly tailored so as to avoid creating this majority's feared "infinite universe of

---

[7] Interestingly, this same article attributes the "asbestos litigation crisis" not to those who, like plaintiffs' decedent, are or were truly ill, but to what the authors describe as healthy plaintiffs who have been "unearth[ed]" by profitable "mass screenings programs." Behrens, *supra* at 479. The authors observe that "'the "asbestos litigation crisis" would never have arisen and would not exist today' if not for the claims filed by the unimpaired." *Id.*, quoting Brickman, *Lawyers' ethics and fiduciary obligation in the brave new world of aggregative litigation*, 26 Wm & Mary Environmental L & Pol'y R 243, 273 (2001). If this is correct, the majority's striving to shelter defendant from liability in the case of someone who did truly ail is unnecessary. According to the majority's own authority, it is not people like Carolyn Miller who are the "problem."

13

potential plaintiffs": "[L]imitless liability would not be created in this case if we found a duty under these particular facts and circumstances." *Chaisson v Avondale Industries, Inc*, 947 So 2d 171, 182 (La App, 2006), clarified 947 So 2d 171 (2007).[8]

But even so, the majority's conclusion that the social costs of imposing a duty outweigh the social benefits requires elevating corporate vitality over the health and well-being of humanity. The majority's statements regarding the social burden abound with tales of corporate bankruptcy, litigation crises, and the costs in dollars that have stemmed *from exposing workers to asbestos*.[9] See *ante* at 21-22. But the majority is strangely silent with respect to the toll that asbestos exposure has taken on human life. By focusing solely on the losses suffered by businesses, the majority fails to account for the social benefits that would ensue from ensuring that people who are exposed to detrimental substances and who, consequently, suffer ruined health, life-altering and life-ending diseases, and the

---

[8] And I would note that the absence of any evidence that Roland rode a bus home from work every day should alleviate the majority's concern that fellow passengers could sue defendant under my rationale. See *ante* at 19 n 17.

[9] I emphasize this because my sense from reading the majority's opinion is that the majority believes that blame for the financial toll asbestos exposure has taken lies with the people who have been injured and who have sued rather than with those who exposed them to the product. This, to me, would be a gross misunderstanding.

loss of family members, are compensated.[10]  When workers are protected from deadly substances, society benefits.  When corporations are held accountable for the consequences their processes have on those who toil to make the corporations viable, society benefits.  When our justice system fairly places the burden of responsibility for dangerous products on the offending party, rather than the one who suffers, society benefits.

Unlike the majority, I would find a tremendous social benefit in imposing corporate accountability, and I would conclude that the social benefits of corporate responsibility and a valued, healthy society easily outweigh the burden of imposing a duty on corporations to mitigate the risk of take-home exposure, especially in light of the fact that they have been required to do so anyway for the last 35 years.

And the majority proclaims that "[n]ot every death or serious injury, however genuinely 'tremendous,' is legally compensable by someone else." *Ante* at 24 n 20.  This is true, but with respect to this case, it is a direct consequence of the majority's holding that an employer who allowed a contaminated worker to

---

[10] And the majority's dire global predictions omit mention of the fact that take-home exposure cases represent only about six percent of total asbestos cases. Plaintiffs' brief on appeal, 30, citing Roggli, et al., *Malignant Mesothelioma and Occupational Exposure to Asbestos: A Clinicopathological Correlation of 1445 Cases*, 26 Ultrastructural Pathology 55 (2002).  For two other recent examples of an improperly skewed analysis of corporate cost versus social benefit, see *Greene v A P Products, Ltd*, 475 Mich 502; 717 NW2d 855 (2006), and *Henry v The Dow Chemical Co*, 473 Mich 63; 701 NW2d 684 (2005).

15

expose his family to a deadly substance had no duty to act differently. It is not that the death is inherently not compensable. Rather, it is after such a holding that the death is not compensable. But the majority fails to comprehend that who must compensate this victim of harm is determined by its own creation and interpretation of law. The majority should not disregard its singular role in preventing compensation and then shrug off the consequences of that role by saying, in essence, "Sorry, not everything is compensable."

And I would not impose liability simply "because Carolyn Miller died" or allow a plaintiff to prevail "no matter how attenuated or remote the relationship between the parties, if a plaintiff has suffered a death, or presumably any kind of serious injury . . . ." *Ante* at 24 n 20. Readers will see through these empty allegations simply by reading this dissent, in which it is thoroughly explained why each factor in the analysis of whether a duty should be imposed weighs in plaintiffs' favor. And readers perusing the opinions of other states that have found a duty in similar circumstances may reject out of hand the majority's assertions that "[t]his is simply not the law . . . in any other state. Nor could it be the law in any reasonably functioning society that desires that social resources be devoted to something other than litigation." *Ante* at 24 n 20. For instance, a Louisiana court easily found a duty for reasons similar to mine:

> In considering the moral, social, and economical factors of imposing a duty, we find that public policy also weighs in favor of finding a duty. First, the economic impact of imposing a duty on Zachry is minimal. The fact that this case presents *res nova* determinations for this Court demonstrates the small number of

16

cases. Second, there is a public policy need to prevent future harm like this from occurring. If courts allow employers to turn a blind eye to potential work hazards simply because they are hired by someone else, companies may be more likely to rely upon others' representations and perform no safety inspections of their own. Third, the possibility of limitless liability is of no concern because finding a duty in this case would not create a categorical duty rule, but one based upon the facts and circumstances of this case. Fourth, the historical precedent and development of institutional guidelines show that courts are holding companies liable for negligence based on unsafe work conditions. This desire for accountability is also shown in the strengthening of OSHA [Occupational Safety and Health Administration] regulations to allow for minimal asbestos exposure to workers and none to household members. Finally, public policy favors a duty in this case where a "construction contractor" took no independent steps to protect its employees' family members from household exposure to hazardous materials. [*Chaisson*, *supra* at 183-184.]

Indeed, not even our federal government believes that requiring employers to protect workers and their families from asbestos exposure is too cumbersome a burden. In fact, quite the opposite is true. OSHA has promulgated stringent requirements on employers whose employees encounter asbestos in the work environment. See 29 CFR 1926.1101. In no uncertain terms, OSHA has set forth strict procedures to decontaminate workers who handle asbestos on the job. These rigorous measures reflect OSHA's awareness that the deadly and communicable nature of asbestos fiber merits mandating an involved process to prevent the spread of asbestos fiber:

(1) Requirements for employees performing Class I asbestos jobs involving over 25 linear or 10 square feet of TSI [thermal system insulation] or surfacing ACM [asbestos-containing material] and PACM [presumed asbestos-containing material].

(i) *Decontamination areas*. The employer shall establish a decontamination area that is adjacent and connected to the regulated

17

area for the decontamination of such employees. The decontamination area shall consist of an equipment room, shower area, and clean room in series. The employer shall ensure that employees enter and exit the regulated area through the decontamination area.

(A) *Equipment room.* The equipment room shall be supplied with impermeable, labeled bags and containers for the containment and disposal of contaminated protective equipment.

(B) *Shower area.* Shower facilities shall be provided which comply with 29 CFR 1910.141(d)(3), unless the employer can demonstrate that they are not feasible. The showers shall be adjacent both to the equipment room and the clean room, unless the employer can demonstrate that this location is not feasible. Where the employer can demonstrate that it is not feasible to locate the shower between the equipment room and the clean room, or where the work is performed outdoors, the employers shall ensure that employees:

(*1*) Remove asbestos contamination from their worksuits in the equipment room using a HEPA [high-efficiency particulate air filter] vacuum before proceeding to a shower that is not adjacent to the work area; or

(*2*) Remove their contaminated worksuits in the equipment room, then don clean worksuits, and proceed to a shower that is not adjacent to the work area.

(C) *Clean change room.* The clean room shall be equipped with a locker or appropriate storage container for each employee's use. When the employer can demonstrate that it is not feasible to provide a clean change area adjacent to the work area or where the work is performed outdoors, the employer may permit employees engaged in Class I asbestos jobs to clean their protective clothing with a portable HEPA-equipped vacuum before such employees leave the regulated area. Following showering, such employees however must then change into street clothing in clean change areas provided by the employer which otherwise meet the requirements of this section.

(ii) *Decontamination area entry procedures.* The employer shall ensure that employees:

(A) Enter the decontamination area through the clean room;

(B) Remove and deposit street clothing within a locker provided for their use; and

(C) Put on protective clothing and respiratory protection before leaving the clean room.

(D) Before entering the regulated area, the employer shall ensure that employees pass through the equipment room.

(iii) *Decontamination area exit procedures*. The employer shall ensure that:

(A) Before leaving the regulated area, employees shall remove all gross contamination and debris from their protective clothing.

(B) Employees shall remove their protective clothing in the equipment room and deposit the clothing in labeled impermeable bags or containers.

(C) Employees shall not remove their respirators in the equipment room.

(D) Employees shall shower prior to entering the clean room.

(E) After showering, employees shall enter the clean room before changing into street clothes.

\* \* \*

(2) Requirements for Class I work involving less than 25 linear or 10 square feet of TSI or surfacing ACM and PACM, and for Class II and Class III asbestos work operations where exposures exceed a PEL [permissible exposure limit] or where there is no negative exposure assessment produced before the operation.

(i) The employer shall establish an equipment room or area that is adjacent to the regulated area for the decontamination of employees and their equipment which is contaminated with asbestos which shall consist of an area covered by a impermeable drop cloth on the floor or horizontal working surface.

(ii) The area must be of sufficient size as to accommodate cleaning of equipment and removing personal protective equipment without spreading contamination beyond the area (as determined by visible accumulations).

19

(iii) Work clothing must be cleaned with a HEPA vacuum before it is removed.

(iv) All equipment and surfaces of containers filled with ACM must be cleaned prior to removing them from the equipment room or area.

(v) The employer shall ensure that employees enter and exit the regulated area through the equipment room or area.

(3) *Requirements for Class IV work*. Employers shall ensure that employees performing Class IV work within a regulated area comply with the hygiene practice required of employees performing work which has a higher classification within that regulated area. Otherwise employers of employees cleaning up debris and material which is TSI or surfacing ACM or identified as PACM shall provide decontamination facilities for such employees which are required by paragraph (j)(2) of this section. [29 CFR 1926.1101(j)(1)-(3).]

(2) *Laundering*.

(i) The employer shall ensure that laundering of contaminated clothing is done so as to prevent the release of airborne asbestos in excess of the TWA [time-weighted average limit] or excursion limit prescribed in paragraph (c) of this section.

(ii) Any employer who gives contaminated clothing to another person for laundering shall inform such person of the requirement in paragraph (i)(2)(i) of this section to effectively prevent the release of airborne asbestos in excess of the TWA and excursion limit prescribed in paragraph (c) of this section.

(3) *Contaminated clothing*. Contaminated clothing shall be transported in sealed impermeable bags, or other closed, impermeable containers, and be labeled in accordance with paragraph (k) of this section. [29 CFR 1926.1101(i)(2)-(3).]

These requirements were instituted despite the financial and other costs to businesses of implementing them. Although these regulations were not in place when John Roland and Carolyn Miller were exposed to asbestos, their existence demonstrates how seriously our government considered the social *detriments* of

20

asbestos exposure when it imposed these obligations on businesses. While the majority views the alleged projected financial costs of take-home exposure liability as too heavy a social burden, I would conclude that whatever those costs may be, they pale in comparison to the social benefit of a healthy people.

Further, in a duty analysis, the extremely toxic nature of asbestos and the fact that the risk of injury can be reduced must be given proper weight because duty is a function of the level of risk. As the Tennessee Court of Appeals explained:

> The foreseeability of [the plaintiff's] injury is further buttressed by the severe gravity of the possible harm—mesothelioma and subsequent death. "[T]he degree of foreseeability needed to establish a duty of care decreases in proportion to the magnitude of the foreseeable harm. 'As the gravity of the possible harm increases, the apparent likelihood of its occurrence need be correspondingly less to generate a duty of precaution.'" *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 433 (Tenn. 1994) (quoting Prosser [& Keeton, Torts (5th ed)], § 31, at 171. [*Satterfield v Breeding Insulation Co, Inc*, unpublished opinion per curiam of the Tennessee Court of Appeals, issued April 19, 2007 (Docket No. E2006-00903-COA-R3-CV).]

Although the majority states that the nature of the risk weighs in plaintiffs' favor, it seems to struggle with giving that factor the weight it deserves. The data, research, and studies definitively establishing a causal relationship are too numerous to mention, but I would point the majority to OSHA's final standards regarding asbestos in the workplace, in which the toxic ramifications of asbestos exposure were painstakingly detailed. See Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite, 51 Fed Reg 22612 (1986). The following are but a few of the conclusions explained in that lengthy document:

OSHA has followed these guidelines in making a determination that the risk of material health impairment resulting from occupational exposure to asbestos is significant. The epidemiological and toxicological evidence and testimony presented in the November notice and in Section IV (Health Effects) of this preamble clearly show that exposure to asbestos is carcinogenic to humans and additionally causes disabling fibrotic lung disease.

* * *

Clinical evidence of the adverse effects associated with exposure to asbestos, tremolite, anthophyllite, and actinolite, is present in the form of several well-conducted epidemiological studies of occupationally exposed workers, family contacts of workers, and persons living near asbestos, tremolite, anthophyllite, and actinolite mines. These studies have shown a definite association between exposure to asbestos, tremolite, anthophyllite, and actinolite and an increased incidence of lung cancer, pleural and peritoneal mesothelioma, gastrointestinal cancer, and asbestosis. The latter is a disabling fibrotic lung disease that is caused only by exposure to asbestos. Exposure to asbestos, tremolite, anthophyllite, and actinolite has also been associated with an increased incidence of esophageal, kidney, laryngeal, pharyngeal, and buccal cavity cancers. [51 Fed Reg 22646, 22755.]

In fact, "a joint NIOSH-OSHA Asbestos Work Group stated that there was no level of exposure to asbestos below which clinical effects did not occur . . . ." *Id.* at 22616.

The severely dangerous character of asbestos should factor much more heavily in the analysis of whether defendant had a duty to mitigate the risk involved. The measures to prevent take-home exposure essentially boil down to ensuring that workers shower and change clothes after encountering asbestos. Just those simple actions have the potential to completely eliminate the risk of take-home exposure. But the majority makes this difficult to discern by grossly overstating the burden of imposing a duty. It concerns itself not with the gravity

of the health risks or even with the relatively marginal costs of prevention. Instead, the majority's central focal point is this statement: "Asbestos claims have given rise to one of the most costly products-liability crises ever within our nation's legal system." *Ante* at 21.

It is a sad day for our citizens indeed when, confronted with a substance that is so dangerous that compensating victims for their losses has had such hefty financial consequences, this Court tilts the scales of justice to *lessen* liability. The analysis should be the opposite. The more dangerous the product, the more critical it is to impose a duty of protection. If protection and accountability increase, litigation eventually decreases because, obviously, the protections reduce injury.

I am persuaded by the reasoning from courts in our sister states that have held that imposing a duty on an employer to mitigate the risk of take-home exposure is reasonable. Like the court in *Zimko v American Cyanamid*, 905 So 2d 465 (La App, 2005), I would conclude that, assuming defendant knew or should have known of the dangers of take-home exposure, "'it is hardly a quantum leap to extend the duty of care owed to employees to members of the employee's household who predictably come into routine contact with the employee's clothing. Such persons would certainly fall within the "range of reasonable apprehension" created by defendant's alleged negligence.'" *Id.* at 483, quoting *In re New York City Asbestos Litigation*, 14 AD3d 112, 121; 786 NYS2d 26 (2004). And as the court stated in *Olivo*:

23

"The inquiry should be not what common law classification or amalgam of classifications most closely characterizes the relationship of the parties, but . . . whether in light of the actual relationship between the parties *under all of the surrounding circumstances the imposition* . . . of a general duty to exercise reasonable care in preventing foreseeable harm . . . *is fair and just*." [*Olivo*, *supra* at 402, quoting *Hopkins v Fox & Lazo Realtors*, 132 NJ 426, 438; 625 A2d 1110 (1993) (emphasis added).]

Fortunately, the majority does not foreclose the possibility of finding a duty with respect to take-home exposure under different circumstances. But I would hold that, under close examination of the circumstances of this case, and accepting the jury's finding that defendant knew or should have known of the risk of take-home exposure, imposing a duty on defendant would be, without doubt, fair and just. Accordingly, I dissent.

Michael F. Cavanagh<br>
Marilyn Kelly

# STATE OF MICHIGAN

## SUPREME COURT

*In re* CERTIFIED QUESTION FROM
THE FOURTEENTH DISTRICT COURT
OF APPEALS OF TEXAS.

---

GLENN MILLER, ESTATE OF CAROLYN
MILLER, SHAWN DEAN, JOHN
ROLAND, and ALMA ROLAND,

      Plaintiffs,

v                                    No. 131517

FORD MOTOR COMPANY,

      Defendant.

---

WEAVER, J. (*dissenting*).

I dissent from this Court's decision to answer a question certified from the Fourteenth District Court of Appeals of Texas.

## I. CONSTITUTIONALITY

I would decline to answer the certified question in this matter because Michigan Court Rule MCR 7.305(B) represents an improper expansion of this Court's limited power under the Michigan Constitution to answer certain certified questions from the Governor and Legislature, and the majority's use of MCR 7.305(B) to answer a question certified by another state's intermediate appellate

court is unprecedented. I continue to question this Court's authority to answer such questions.[1]

Michigan Court Rule 7.305 addresses "certified questions." MCR 7.305(B) articulates the power the Michigan Supreme Court has created for itself to answer certified questions from other courts, stating:

> (1) When a federal court, a state appellate court, or tribal court considers a question that Michigan law may resolve and that is not controlled by Michigan Supreme Court precedent, the court may on its own initiative or that of an interested party certify the question to the Michigan Supreme Court.

MCR 7.305 is a modified version of the Uniform Certification of Questions of Law Act (UCQLA), which provides states a model for court rules on certified questions of law.[2] The UCQLA has not been adopted by the people of Michigan by constitutional amendment, nor has it been adopted by the Michigan Legislature.

---

[1] See, e.g., *Proposed Amendment of MCR 7.305*, 462 Mich 1208 (2000) (Weaver, J., dissenting); *In re Certified Question (Wayne Co v Philip Morris, Inc)*, 622 NW2d 518 (Mich, 2001) (Weaver, J., dissenting); *In re Certified Question (Kenneth Henes Special Projects Procurement, Marketing & Consulting Corp v Continental Biomass Industries, Inc)*, 468 Mich 109; 659 NW2d 597 (2003) (Weaver, J., concurring in the result only); *In re Certified Questions (Melson v Prime Ins Syndicate, Inc)*, 472 Mich 1225 (2005) (Weaver, J., concurring).

[2] The "power to answer" section of the UCQLA, 95 § 3, provides:

> The [Supreme Court] of this State may answer a question of law certified to it by a court of the United States or by [an appellate]
> (continued…)

MCR 7.305(B) improperly expands this Court's power by granting the Michigan Supreme Court the authority to answer a certified question beyond the scope authorized by the Michigan Constitution. Article 3, § 8 of the Michigan Constitution states:

> Either house of the legislature or the governor may request the opinion of the supreme court on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date.

MCR 7.305(B) goes beyond the duties articulated in article 3, § 8 because it undeniably expands the scope of those who may request answers to questions of law, when the questions can be answered, and what types of questions may be answered.

MCR 7.305(B) broadly permits "a federal court, state appellate court, or tribal court" to certify questions of law to the Supreme Court of Michigan, while

_____

(…continued)

> [the highest] court of another State [or of a tribe] [or of Canada, a Canadian province or territory, Mexico, or a Mexican state], if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State.

The UCQLA suggests that "an appellate court of another State" or "the highest court of another State" may be the appropriate certifying body. Further, the UCQLA suggests that the answer to a certified question would be determinative.

3

the Michigan Constitution only allows for advisory opinions to issue in response to certain requests from the state Legislature or the Governor. Further, MCR 7.305(B) allows an issuing body to ask "a question that Michigan law may resolve and that is not controlled by Michigan Supreme Court precedent." Article 3, § 8, on the other hand, constrains the question of law to be one that is "important" and rests on the "constitutionality of legislation after it has been enacted into law but before its effective date." Moreover, MCR 7.305(B) lacks any limiting language on when the Court may answer a certified question, leaving the door and the docket open to the whims of the majority. In contrast, the Michigan Constitution limits advisory opinions by the Supreme Court, on the constitutionality of legislation, to be issued only on "solemn occasions" and "after [legislation] has been enacted into law but before its effective date." Const 1963 art 3, § 8. MCR 7.305 unduly expands the scope of this Court's judicial powers.

Furthermore, MCR 7.305(B) does not and cannot give binding effect to Michigan Supreme Court opinions answering certified questions. Any such answers are merely advisory and do not have binding or precedential value. Thus, this Court's opinion answering the question certified by the Texas Court of Appeals has no more precedential value than a brief submitted to that court. [3]

---

[3] As noted by Justice Levin in *In re Certified Question (Bankey v Storer Broadcasting Co),* 432 Mich 438, 467-471; 443 NW2d 112 (1989),

(continued…)

4

(…continued)

In the instant case, the response to the certified question will not determine the controversy. No binding order or judgment will be entered. The response will not be made effective by a final judgment, decree or process of this Court. No decision of this Court that will be binding on the parties or that will be res judicata of an issue will be entered by the Court. The response does not end the controversy, and this Court has no way of enforcing its response to the certified question by appropriate means.

\* \* \*

It appears that because the response to the certified question in the instant case would not be determinative of the cause or controversy and, even if it were, the response cannot be enforced through an order or judgment of this Court, that the response to this certified question is not the exercise of judicial power but closer to an advisory opinion.

The 1908 Constitution did not authorize this Court to issue advisory opinions. The 1963 Constitution authorizes the Court to provide the Legislature or the Governor with an advisory opinion.

\* \* \*

Advisory opinions are not precedentially binding under the doctrine of stare decisis.[18]

---

[18] *Advisory Opinion on Constitutionality of 1975 PA 227*, 396 Mich 465; 242 NW2d 3 (1976); *Cassidy v McGovern*, 415 Mich 483; 330 NW2d 22 (1982), "modified" on other grounds *DiFranco v Pickard*, 427 Mich 32, 58; 398 NW2d 896 (1986).

---

## II. OTHER CONCERNS BEYOND CONSTITUTIONALITY

This Court's decision to answer a certified question from another state's intermediate appellate court is unprecedented. This Court's decision to use MCR 7.305(B) to answer the certified question in this case exceeds how other states have answered certified questions. Although MCR 7.305(B) grants this Court the authority to answer a certified question from "a federal court, state appellate court, or tribal court," the power is not constitutionally derived and goes beyond how any other state has ever applied certified question laws.

Forty-six states have adopted or created a modified version of the UCQLA, § 1-14 (1995) and not one single state has utilized the reach of its rule as broadly as the majority does here today.[4] By answering a certified question from an intermediate appellate court of another state, the majority does what no other

---

[4] See Alabama, ARAP Rule 18; Alas R App Proc 407; Ariz Sup Ct R 27; Arkansas, AR S Ct & Ct App Rule 6-8; CAL Rule of Court 8.548; Colorado, CAR 21.1; Conn Practice Book § 82-1; Del Sup Ct R 41; Fla R App P 9150; Ga Sup Ct Rule 46; Hawaii, HRAP Rule 13; Idaho, IAR Rule 12.2; Ill Sup Ct Rule 13; Ind R App P 64; Iowa Code § 684A.1; Kansas, KSA § 60-3201; Ky CR Rule 76.37; La Sup Ct R XI; Me R App P 25; Md Courts and Judicial Proceedings Code Ann § 12-603; Massachusetts, ALM Sup C Rule 1:03; Michigan, MCR 7.305(B); Miss, MRAP 20(a); Mont Code Ann, Ch 21, Rule 44; Nebraska, RRS Neb § 24-219; Nev RAP 5; NH Sup Ct Rule 34; NM RAP 12-607; ND R App P 47; Ohio S Ct R XVIII; Oklahoma, 20 Okl St § 1602; Oregon, ORS § 28.200; PA Sup Ct Internal Operating Proc 10; RI Sup Ct Art I, Rule 6; South Carolina, SCACR 228; SD Codified Laws § 15-24A-1; Tenn Sup Ct R 23, § 1; Tex R App P 58; Utah R App P 41; Vermont, VRAP Rule 14; Va Sup Ct R Pt 5, 5:42; Washington, Rev Code Wash (ARCW) § 2.60.020; W VA Code § 51-1A-3; Wis Stat § 821.01; Wyoming, WRAP 11.01.

state has done even when they have been explicitly granted the power to do so. Nineteen states, including Michigan, permit another state to certify questions of law to the supreme court of that state.[5]  Of those 19 states, eight restrict the asking court to the "court of last resort" or the "highest appellate court" of another state.[6] Five states, including Michigan, each allows "an" or "any appellate court" of another state to certify questions of law to the supreme court of that state—by reference an intermediate appellate court may be authorized to certify a question to the state supreme court.[7]  From my research it appears that *no state has ever answered a question certified to it by another state intermediate appellate court*. The majority's decision today to answer a question certified by the Texas Court of Appeals is unprecedented.  It leaves to another time for one to ponder why the

---

[5] See CAL Rule of Court 8.548; Conn Practice Book § 82-1; Del Sup Ct R 41; Ga Sup Ct Rule 46; Iowa Code § 684A.1; Kansas, KSA § 60-3201; Ky CR Rule 76.37; Md Courts and Judicial Proceedings Code Ann § 12-603; Massachusetts, ALM Sup Ct Rule 1:03; Michigan, MCR 7.305(B); Mont Code Ann, Ch 21, Rule 44; NM RAP 12-607; ND R App P 47; Oklahoma, 20 Okl St § 1602; Oregon, ORS § 28.200; South Carolina, SCACR 228; Va Sup Ct R Pt 5, 5:42; W VA Code § 51-1A-3; Wis Stat § 821.01.

[6] See CAL Rule of Court 8.548; Conn Practice Book § 82-1; Del Sup Ct R 41; Ky CR Rule 76.37; Massachusetts, ALM Sup Ct Rule 1:03; Mont Code Ann, Ch 21, Rule 44; Va Sup Ct R Pt 5, 5:42; Wis Stat § 821.01.

[7] See Ga Sup Ct Rule 46; Md Courts and Judicial Proceedings Code Ann § 12-603; Michigan, MCR 7.305(B); NM RAP 12-607; Oklahoma, 20 Okl St § 1602.

majority chooses to reach so far "deep into the heart of Texas" to answer a question posed by the Texas Court of Appeals, an intermediate appellate court.

## III. CONCLUSION

I dissent from this Court's decision to answer the certified question in this case because MCR 7.305(B) goes beyond this court's constitutional authority to answer certified questions and the majority's decision to answer the certified question in this case is unprecedented and unnecessary.

Elizabeth A. Weaver

Kelly, J., concurred with part II of Justice Weaver's opinion.