■ CATHERINE WIDERA et al., Appellants, v ETTCO WIRE AND CABLE CORP., Respondent. [611 NYS2d 569] —In an action to recover damages for personal injuries, etc., the plaintiffs appeal, as limited by their brief, from so much of an order of the Supreme Court, Queens County (Di Tucci, J.), dated March 10, 1992, as, upon granting the defendant's motion for partial summary judgment, searched the record, and dismissed so much of the first cause of action in the complaint as sounded in common-law negligence.

Ordered that the order is affirmed insofar as appealed from, with costs.

The plaintiffs allege that the infant plaintiff Catherine Widera was exposed to toxic chemicals while in utero and, as a result, suffers from various physical infirmities. As stated in the complaint and as amplified by the bill of particulars, the exposure took place when the infant plaintiff's father brought his work clothes home to be washed by his then pregnant wife. During the time in question, he was employed by the defendant as either an "extruder helper" or a "blender operator" and, in the course of his employment, was exposed to various toxins.

In their complaint the plaintiffs alleged two causes of action. The first cause of action sought to recover damages for personal injuries to the infant plaintiff based on (1) common-law negligence and (2) violations of various provisions of the New York State Labor Law and the Federal Occupational Safety and Health Act (hereinafter OSHA). The second cause of action was a derivative claim on behalf of the infant's father for loss of services. The defendant moved for partial summary judgment to dismiss so much of the first cause of action as alleged liability under the Labor Law and OSHA. The Supreme Court granted the motion, and, upon searching the record, dismissed the entire first cause of action holding that "no cause of action exists on behalf of the infant plaintiff

pursuant to common law negligence, the Labor Law or OSHA". On appeal the plaintiffs have abandoned any argument regarding that portion of their first cause of action which asserted a claim pursuant to the Labor Law or OSHA. Instead, the plaintiffs argue that the Supreme Court erred in dismissing so much of the first cause of action as sounded in common-law negligence.

Upon our review of the facts of this case as well as the applicable legal principles involved, we conclude that the Supreme Court properly dismissed the plaintiffs' entire first cause of action, including any cause of action based upon common-law negligence. Under common law, an employer had the duty to provide employees with a safe workplace *(see,* Labor Law § 200; *Russin v Picciano & Son,* 54 NY2d 311, 316-317; *Allen v Cloutier Constr. Corp.,* 44 NY2d 290, 299; *Maddox v City of New York,* 108 AD2d 42, *affd* 66 NY2d 270). However, that duty has not been extended to encompass individuals, such as the infant plaintiff, who are neither "employees" nor "employed" at the worksite *(see, Mordkofsky v V.C.V. Dev. Corp.,* 76 NY2d 573, 577; *Albala v City of New York,* 54 NY2d 269; *Tobin v Grossman,* 24 NY2d 609, 615-616; *cf., Woods v Lancet,* 303 NY 349). Nor does our research reveal a reported case from any jurisdiction where an employer's duty has been interpreted to extend to a person, such as the infant plaintiff, who is injured in the manner alleged herein. Since, in the absence of a duty there can be no liability, the Supreme Court properly dismissed that branch of the first cause of action sounding in common-law negligence *(see, Johnson v Jamaica Hosp.,* 62 NY2d 523, 528; *Pulka v Edelman,* 40 NY2d 781, 785; *Henry v Vann,* 124 AD2d 783, 784, *affd* 71 NY2d 76).

In reaching this conclusion, we are not unaware that "[i]n fixing the bounds of * * * duty, not only logic and science, but policy play an important role" *(DeAngelis v Lutheran Med. Ctr.,* 58 NY2d 1053, 1055). However, it must also be recognized that there is a responsibility to consider the larger social consequences of the notion of duty and to correspondingly tailor that notion so that the illegal consequences of wrongs are limited to a controllable degree *(see, Eiseman v State of New York,* 70 NY2d 175, 187; *Waters v New York City Hous. Auth.,* 69 NY2d 225; *Tobin v Grossman, supra).* The recognition of a common-law cause of action under the circumstances of this case would, in our opinion, expand traditional tort concepts beyond manageable bounds and create an almost infinite universe of potential plaintiffs. Accordingly, we decline to promulgate a policy which would extend the common

law so as to bring the infant plaintiff within a class of people whose interests are entitled to protection from the defendant's conduct. Thompson, J. P., Santucci and Florio, JJ., concur.

Friedmann, J., dissents, and votes to reverse the order insofar as appealed from, on the law, and to reinstate the cause of action sounding in common-law negligence, with the following memorandum: I respectfully dissent, and would reinstate the plaintiffs' negligence cause of action, as dismissal of the complaint based on "lack of duty" as a matter of law is against the trend of evolving law. It is worthy of note at the outset that the defendant did not move for this relief—as if in tacit acknowledgement that it was not warranted, but that the Supreme Court decided to reach the issue *sua sponte,* without affording the plaintiffs an opportunity to address it.

The infant plaintiff Catherine Widera sued to recover damages for injuries that she claimed she sustained while in utero as a result of her mother's exposure to lead dust and other toxins brought home by her father, the plaintiff Matthew Widera, from his employment as an "extruder helper" and a "blender operator" with the defendant, Ettco Wire and Cable Corp. (hereinafter Ettco).

The plaintiffs' theory is that during the course of his employment with Ettco, from 1967 to February 1973 when Catherine was born, Matthew "hand-fed" "dry blended", lead-laced products into various receptacles as part of his job, and then took his work clothes, laden with lead dust, home for his wife to launder.

Matthew himself suffered from "a severe skin rash and/or irritation * * * related to * * * lead exposure and lead intoxication", while his wife, the plaintiffs theorize, inhaled and otherwise absorbed (e.g., through the skin) the lead particles adhering to his work clothes as she washed them. Once in the mother's blood stream, the lead is believed to have traversed the placenta and damaged the developing fetus, resulting in the child's current complaints of, *inter alia,* brain damage, a seizure disorder, cerebral palsy of the right foot, and learning disabilities.

Both the plaintiff and her injuries were foreseeable, and sound policy dictates that defendant be held to a standard of reasonable care for the protection of such an innocent, foreseeable plaintiff, or assume the costs of its negligence. At the least, the case should be permitted to proceed through discovery, to flesh out the issues of whether or not the defendant was in fact negligent, whether it knew or should have known

of the dangers posed to the families of its workers who took home their lead-contaminated work clothes for laundering, and whether the plaintiff can establish a causal nexus between her injuries and the defendant's breach of its duty of reasonable care.

" '[D]uty' is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in the light of the apparent risk * * * But it should be recognized that 'duty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection" (Prosser, Torts § 53, at 324-326 [4th ed]). Whether or not a "duty" runs from the defendant to the plaintiff is an issue of law, and "is never for the jury" (Prosser, Torts § 45, at 289 [4th ed]). While generally, "[t]he defendant is required to be reasonably careful, for the protection of those to whom harm can be foreseen", courts must "stop short of infinite liability" (Prosser, Torts § 43, at 257 [4th ed]).

In determining whether a duty exists in, for example, the case of an arguably unforeseeable plaintiff, "[t]he real problem, and the one to which attention should be directed, is one of social policy: whether the defendants * * * should bear the heavy negligence losses of a complex civilization, rather than the individual plaintiff. Because these defendants are in large measure public utilities, governmental bodies, industries * * * and others who by rates, prices, taxes or insurance are better able to distribute the loss to the general public, many courts may reasonably consider that the burden should rest upon them, and experience no great difficulty in finding a 'duty' of protection" (Prosser, Torts § 43, at 257 [4th ed]). A court's finding of "duty" is therefore inextricably intertwined with policy decisions.

"When dealing with the common law, appellate jurists are constantly functioning as policy-makers, weighing the unquestionable value of stare decisis against the wisdom of departing from precedent in response to a shifting social, economic, political and legal climate" (Titone, *State Constitutional Interpretation: The Search for an Anchor in a Rough Sea,* 61 St John's L Rev 431, 433 [1986]; *see also,* Kaye, *The Human Dimension in Appellate Judging: A Brief Reflection on a Timeless Concern,* 73 Cornell L Rev 1004, 1011 [1988]). As the Court of Appeals observed in *Woods v Lancet* (303 NY 349), when it broke with precedent in recognizing an infant's right

to recover against a doctor for injuries that it sustained in utero: "We act in the finest common-law tradition when we adapt and alter decisional law to produce common-sense justice" *(Woods v Lancet, supra,* at 355).

Underlying the very existence of the common law is the principle that every wrong should have a remedy, and that " 'wherever a new injury is done, a new method of remedy must be pursued' " (3 Blackstone, Commentaries 123, quoted in *Renslow v Mennonite Hosp.,* 67 Ill 2d 348, 360, 367 NE2d 1250, 1256 [Dooley, J., concurring]). The argument that all such changes should be wrought by legislation is answered in *Woods v Lancet (supra,* at 355): "Legislative action there could, of course, be, but we abdicate our own function, in a field peculiarly nonstatutory, when we refuse to reconsider an old and unsatisfactory court-made rule" *(see also, Smith v Brennan,* 31 NJ 353, 157 A2d 497).

Following *Woods* in New York, courts here and in other jurisdictions have progressively expanded plaintiffs' rights to sue for injuries suffered prenatally. In so doing, they have rejected the old rule, enunciated, e.g., in *Dietrich v Inhabitants of Northampton* (138 Mass 14), that defendants owed no "duty" to persons not yet legally in being.

The impetus in *Woods* and other early cases appears to have derived from scientific "advances". For example, insights into fetal evolution rendered academic considerations of fetal "viability" at the time of injury, in view of medical developments that could keep relatively immature fetuses alive, and in further view of the realization that denial of a right of action for injuries to the previable fetus could cut off some of the most meritorious claims, since congenital structural defects caused by factors in the prenatal environment are most commonly sustained early in the previable stages *(see,* Note, *The Impact of Medical Knowledge on the Law Relating to Prenatal Injuries,* 110 U Pa L Rev 554, 563). In this group are cases such as *Kelly v Gregory* (282 App Div 542 [child born alive could sue motorist who struck his mother during the third month of her pregnancy, causing plaintiff prenatal damage]); *Smith v Brennan* (31 NJ 353, 157 A2d 497, *supra* [same]); and *Womack v Buchhorn* (384 Mich 718, 187 NW2d 218 [same]; *see also, Hughson v St. Francis Hosp.,* 92 AD2d 131 [infant born alive has cognizable independent cause of action against a physician for prenatal injuries arising out of the failure to obtain the informed consent of the mother]).

More recently, the efforts to expand liability have derived

from such negative scientific developments as the proliferation of toxins in the environment, and the deleterious effects of various pharmaceutical agents (e.g., DES) on successive generations of plaintiffs. In these cases, courts have tended to balk at extending, without precedent, liability to defendants remote in space and/or time from the injuries that they have caused —notwithstanding largely undisputed foreseeability and causation—because such expansion raises the specter of "infinite liability". Among the New York cases barring recovery for, e.g., preconception torts, are: *Enright v Lilly & Co.* (77 NY2d 377, *cert denied* 502 US 868, 112 S Ct 197 [recognizing an infant plaintiff's right of action for its *own in utero* exposure to DES, but declining to extend liability to that child's genetically damaged offspring]); *Albala v City of New York* (54 NY2d 269 [declining to extend cause of action to later-conceived children of person whose reproductive organs were damaged by defendants]); and *Catherwood v American Sterilizer Co.* (126 AD2d 978 [declining to permit claim of later-conceived, chromosomally damaged child of woman exposed to ethylene oxide on the job]).

Not all jurisdictions have been so restrictive, however. Thus, in *Renslow v Mennonite Hosp.* (67 Ill 2d 348, 367 NE2d 1250, *supra),* the Supreme Court of Illinois ruled that an infant plaintiff could maintain an action against a hospital and physician for injuries she sustained as the result of negligent transfusion of RH-positive blood into her RH-negative mother, even though the transfusion had occurred several years prior to the infant's conception. The Illinois Court found that the defendant had breached a "contingent prospective duty to a child not yet conceived but foreseeably harmed by a breach of duty to the child's mother" *(Renslow v Mennonite Hosp.,* 67 Ill 2d 348, 356, 367 NE2d 1250, 1254, *supra).*

The case at bar belongs to a factual middle ground, as to which the law in New York and elsewhere is equally unsettled, but which does not present the same degree of disturbing attenuation between a defendant's negligence and a plaintiff's injuries as do, for example, the DES cases, where grandchildren were not permitted to sue for damages incurred due to a remote progenetrix's ingestion of the drug *(see, e.g., Enright v Lilly & Co., supra).*

Here, by contrast, the plaintiff's father worked with products "dry blended" with lead, which he "hand-fed into barrels and/or tubs". The defendant knew or should have known that lead was toxic (Matthew Widera suffered from skin irritations because of his exposure to it), and that its employee took his

soiled work clothes home to be laundered by his wife. It was foreseeable that Matthew Widera, who was 27 years old in 1973, would father children, and that the introduction into his domestic environment of a toxin known to be deleterious to infants could cause damage *(see, e.g., Automobile Workers v Johnson Controls,* 499 US 187). In any event, a jury should be allowed to consider whether the defendant at bar should have taken precautions to prevent the syndrome known as "fouling the nest" that was being documented in the scientific literature at about the same time.

In the 1970's numerous papers were published documenting lead poisoning in children of fathers who worked in lead-saturated environments, and who brought the pollutants home in the form of lead-dust on their work clothing. The lead dust —which mixed with household dust, particularly around washing machines, and inside the family laundry itself—was measured as resulting in increased blood lead levels among family members, and particularly among the youngest children and pregnant females, whose placentas were discovered to be entirely permeable to lead. The consequences in children included brain damage, central nervous system disorders, seizures, and learning disabilities—ailments similar to those complained of by the infant plaintiff here *(see, e.g.,* Baker, *Lead Poisoning in Children of Lead Workers: Home Contamination with Industrial Dust,* N Engl J Med 296: 260 [1977]; Clark, *Placental Transfer of Lead and its Effect on the Newborn,* Postgrad Med J 53: 674 [1977]; Chisholm, *Fouling One's Own Nest,* Pediatrics 62: 614 [1978]; *see also,* Campbell & Landrigan, *Chemical and Physical Agents,* ch 17; Sweet & E. Brown, *Fetal and Neonatal Effects of Maternal Disease* [Mosby Yearbook]; McDiarmid & Weaver, *Fouling One's Own Nest Revisited,* Am J Indus Med 24: 1 [1993]).

In this regard, it is significant that as early as 1956 laborers in battery plants were obliged to change clothes at the beginning of their shift, and shower and change again at the end of it, to obviate carrying "caustic and toxic materials" home on their bodies and apparel; and the time devoted to these activities was ruled compensable by the employer as a necessary part of the job *(see, Steiner v Mitchell,* 350 US 247; *see also,* Landrigan, *The Safety of the Nest,* AAP News, June 1986, at 18 ["Prevention (of 'fouling of the nest') is achieved through common sense measures such as providing workers with work clothing which is laundered at work (rather than at home), and by providing workers an opportunity to shower before they leave work"]).

Although legal precedent respecting this factual middle ground is equivocal, it inclines toward expanding a duty toward an infant plaintiff from its parent's employer *(see, e.g., Riebow v Quemetco, Inc.,* 148 AD2d 692; *Gray v Stillman White Co.,* 522 A2d 737 [RI]). In *Automobile Workers v Johnson Controls* (499 US 187, 211-214 [White, J., concurring] [1991], *supra),* the United States Supreme Court acknowledged that employers may be subject to tort liability for prenatal injuries suffered by offspring whose parents work in lead-contaminated environments. Additionally, a Federal District Court in Tennessee has found that such family-member plaintiffs are not barred by Workers' Compensation from suing, because they are not employees *(see, Brewer v Monsanto Corp.,* 644 F Supp 1267, 1274).

To find no duty, and to foreclose Catherine Widera from presenting her case to a jury, is as much a policy decision as is permitting her to complete discovery. In my view, the sounder policy would be to declare as a matter of law that a duty extends in such circumstances from the employer to its employee's unborn child, and to permit the injured plaintiff to go forward with her case.